Eanney, J.
The complainant, as treasurer of Hamilton county, .seeks, by this bill, to recover of the defendant the amount of tax assessed for the year 1851 upon its capital stock loaned in that county, and upon the surplus and contingent fund belonging to the company, under the provisions of the act of March 21, 1851, “to tax banks and bank and other stocks, the same as other property is now taxable by the laws of this state.”
Two points of defense are made, and claimed to be established; 1st. That there is not now, and was not at the filing of the bill, •.any subsisting tax against the company, or, if there was, that the remedy by bill in equity could not be pursued. 2d. That the act ■under which the tax was levied was unconstitutional and void.
That the tax was actually levied and remains unpaid, and that this remedy was given for its collection by that act, is admitted; but ■the position is rested solely upon the repealing clause of the act of April 13,1852, “ for the assessment and taxation of all property in this state, and for levying taxes thereon according to its true value in money.” The 77th section of this latter act, after referring to ■several tax laws, and amongst them the act of 1851, by their titles, concludes thus: “And all parts of laws superseded by this act, and inconsistent therewith, are hereby repealed.”
In support of the position, it is argued that this effected an entire repeal of the act of 1851, without any saving whatever; *and, as a consequence, all accruing rights not closed and ■perfected fell with it; and that the tax in question must be so regarded, and being a proceeding, if not penal in its character, entirely statutory, the legislature have, in effect, remitted it by the repeal of the law under which it was levied; but, if not remitted, this remedy, unknown to the ordinary jurisdiction of a court of equity, is at least gone. So far as the objection goes to the continued existence of the tax, it is equally applicable to all the delinquent taxes in the state, upon every species of property, remaining unpaid at the time the repealing section was enacted.
A conclusion so unjust, and working such disastrous consequences, ought not certainly to be hastily adopted, and not at all, if *486 it can be avoided without violating any established principle of law.
But are the premises correct from which it is drawn ? In the-first place, it is very far from being as clear .as is assumed that the-repealing clause is absolute in its terms. It is certainly very inartificially worded; but no violence would be done to the language by extending the clause quoted to the acts named in the previous-part of the section, as well as all other acts upon the subject, and holding that only so much and such parts of any of them were intended to he repealed as were “ superseded by ” and “ inconsistent ” with -that act. In aid of this construction, well-established principles might be invoked. Whether the repeal of a statute is absolute- or modified, is always a question of legislative intention ; and the legislature will not he presumed to have intended an absurd or unjust consequence. The language, if clear, it is true, must govern hut strict grammatical accuracy need not he observed; and if it. will hear a construction consistent with justice and right, although not in strict accordance with the words used or their arrangement, the courts are nob only permitted, but bound to presume the legislature intended such construction to be put upon them. But, however this may he, it is admitted to he an established rule that the-repeal of a statute will not destroy or affect ^rights already vested under it; hut all acts done and perfected while it was in foi'ce will remain good and effectual. It is very clear to ns that this tax became a vested right in the public, fully perfected within the-meaning of this rule long before the passage of the act of 1852, and could not he affected by the repeal of the law under which it was levied, however absolute that might be. Every act required of the public authorities in the assessment and levy had been done, and the liability of tbe defendant fully fixed. Nothing remained hut the payment of the money; and the failure of the defendant to do this surely could not render imperfect the right of the public to receive it, which is as clearly a vested right as though the debt were reduced to possession. Nor does it partake in the slightest, degree of the character of a penalty. The obligation of every citizen to contribute, in proportion to his property, to the support of the government which protects him in its enjoyment, is not only a high moral duty, but arises necessarily from the compact into-which he has entered with his fellow-citizens, and for which he-receives, not only in contemplation of law, but in fact, a valuable- *487 consideration. It is a common burden assumed by all, and levied equally upon the property of all—the infant and law-abiding, as well as the law-breaking; while a penalty in its very nature implies a punishment for a wrong .done or duty omitted. When a part have paid their portion towards the discharge of the common burden, an obligation of the most equitable character arises against, the balance, who have equally shared the benefit, to contribute theirs ; and its enforcement is no nearer the punishment implied in a penalty, than that of a somewhat similar obligation arising between joint debtors or co-sureties.
The right to the tax still remaining, a remedy must somewhere exist to collect it. We are of opinion that the provisions of the act of 1851 may be regarded as having a temporary continuance for the enforcement of the rights which accrued under it; upon the principle settled in Moore v. Houston, 3 Serg. & R. 185, where it was held that, though %n act repeals a former act, yet, if it appears upon the whole that the legislature intended certain parts of the former act to have a temporary continuance, it is not an immediate repeal as to such p'arts. And this view is rendered nearly conclusive from the fact that the legislature literally re-enacted those provisions in the act of'1852; and. thus the case is brought within the principle settled by the late court in bank, in Mitchell v. Eyster, 7 Ohio, 257. And, while it is true that these provisions in the last law do not in terms extend beyond the enforcement of taxes assessed under its provisions, yet taken in connection with the former, it is a sufficiently clear expression of legislative intention, that this should continue to be the forum employed for the collection of unpaid taxes assessed under either law.
This brings us to the main question in the case: Was the tax legal when assessed ? The solution -of this question is made -to depend entirely upon the answer to be given to another; Was the act under which it was levied a constitutional enactment? The object and principal provisions of this act may be veiy shortly'stated. It makes it the duty of the president and cashier of each banking institution in the state having the right to issue bills or notes for circulation, annually to list and return to the assessor, in the township or ward where the bank is located, the amount of capital stock at its true value in money, .together with the amount of surplus .and contingent fund belonging to- such institution; upon which the *488 same amount of tax is to be levied and paid as upon the property of individuals.
By the 3d section, the Ohio Life Insurance and Trust Company is brought within the provisions of the act, and subjected, in any of the several counties where its capital stock is loaned, to the average rate of taxation for all purposes levied in such county, upon the amount so loaned.
The 5th section provides that “ the taxes levied and collected in pursirance of the provisions of this act shall be in lieu of any taxes which such bank or banking company would, by existing laws, be required to pay on its dividends or profits.”
*Upon the abstract justice of this tax, aside from any constitutional inability to impose it, there can scarcely be two opinions. The same amount, and for the same purposes, is imposed upon money employed in banking as upon all other property. No tax whatever is levied upon the valuable franchises enjoyed by these institutions; nor is it pretended that any bonus or other pecuniary •consideration was ever paid the state for them. But the question ■of power to impose it is fairly raised, and must be determined upon its own merits. The act is claimed to impair the obligation ■of certain contracts existing between this institution and the state, by which the state has limited its right to tax the institution beyond a certain amount, and in a certain specified manner—that this .act alters the mode and increases the amount, and is therefore in conflict with art. 1, sec. 10, of the constitution of the United States-; .and a corresponding provision in art. 8, sec. 16, of the constitution ■of this state, then in force.
These contracts are said to be found in the charter of the company ; in the first section of the act “ to prohibit the circulation of •small bills,” passed March 14, 1834, 1 Curwen’s Rev. Stat. 256, and in the 60th section of the act to incorporate the State Bank of Ohio .and other banking companies, 43 Ohio L. 24, passed February 24, 1845. A brief reference to the provisions of these acts will exhibit the strength of the position assumed.
The company was incorporated February 12,1834, with a capital stock of two millions of dollars, and empowered to make insurance ■on lives—to grant and purchase annuities—to make other contracts involving the interest or use of money and the duration of life—to receive money in trust either from individuals or by order of any *489 ■ court of record—to buy and sell drafts and bills of exchange—and to hold real estate necessary to the transaction of its business.
By the 23d section it was invested with banking powers until tha year 1843, and authorized to issue notes and bills, under the regulations and to the amount therein specified.
*The only provision relating to taxes is found in the 25th section, which reads: “ No higher taxes shall be levied on the capital stock or dividends of the company than are or may be levied ■on the capital stock or dividends of incorporated banking institutions in this state.”
By the section of the act of 1836 referred to, the auditor of state, .after receiving the statement of the dividends of the several banks ■of the state, was required to draw on them for the amount of twenty per cent, on such dividends for taxes ; but if, within a time limited, .any bank should surrender its right to issue or circulate small bills, he was authorized to draw on such bank for only five per cent, on its dividends declared after its surrender.
The 60th section of the act of 1845 provides that, “ Each banking company, organized under this act, or accepting thereof, and •complying with its provisions, shall semi-annually, on the days •designated in the 59th section for declaring dividends, set off to the state six per centum on the profits, deducting therefrom the expenses, and ascertained losses of the company for the six months next proceeding; which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject.
From these several acts, two separate and distinct contracts are ■claimed to be established, the first growing out of the surrender by the company of the right to issue small bills under the act of 1836, and limiting the state to five per centum on its dividends ; and the other arising under the act of 1845, fixing the rate of taxation upon the banks organized under its provisions, which, it is insisted, could not subsequently be changed without their consent, and which, by the charter of this company, became its rule of taxation; limiting the state to six per centum on the net profits
I. Aside from the considerations alluded to hereafter, and assuming as correct all that is claimed for the act of 1836, we are clearly of opinion that it had no application to this company after 1843, .and is consequently ineffectual to ^sustain the claim made *490 under it. The object of the law, as indicated in its title, was to-suppress the circulation of small bills. To obtain this it levies a higher annual tax upon the banks that continue to issue them than upon those that surrender the right. The proposal is made to no-bank by name, but to every bank of circulation having the right conferred by its charter to issue or circulate these bills and to no-others. This institution, then, had that right, and may properly be numbered with those to whom it was addressed. But this right ceased to exist in 1843, and with it the law ceased to have any further application. It then became strictly what its name imports, a life insurance and trust company without any such banking powers whatever. It no longer came within the policy of the law ox-its terms ; and to apply the law longer to it would be to subvert both. As a bank having the xúght to circulate small bills, it wasaddx-essed in common with others of like character; as such bank, it surx-endered the xúght; and as such bank it has long since ceased, to exist. As long as tbe right endured, it received the stipulated equivalent annually in the reduced tax ; and it can certainly make no difference that all its corporate'powers for other purposes did not cease at the same time with its banking powers.
II. The claim made under the act of 1845 is of much graver importance, and in its investigation questions have, been raised and. discussed of the most vital importance to the state and the people. On tlie one hand, tbe state, by statutes and constitutional provisions, has constantly claimed the right to impose taxes upon the-property of companies formed under it, equal to aixd in common with those imposed upon the property of individuals ; and to vary them from time to time as the exigencies of the state might require. On the otlxex’, this claim has boon as constantly opposed by these-institutions. Insisting upon the section already quoted, as a contract between them and the government, they have uniformly denied the power of the state to change it in any particular. The question is now, *for the first time, presented in this court, and we have endeavored to give it the consideration its importance demands, so far as other- pressing duties would permit.
It is admitted by counsel for the company that “the taxes levied xxpon the capital stock or dividends of incorporated banks in Ohio in 1851, when this tax was assessable, gives the rule of taxation against the companyand it is not denied that this tax was levied in conformity to the act of 1851, and is the same to which the banks *491 were subjected. But if that act was invalid, ás is claimed, the act of 1845 continued in force and was applicable to much the largest number of banks in the state. It is very questionable whether the principle upon which the admission proceeds might not be carried much further, and to a point entirely fatal to the defense. On the same day upon which the act of 1851 was passed, the general assembly passed a law “ to authorize free banking,” under which a. number of banks were immediately formed; which were undeniably subjected to taxation under the former law. If counsel are correct, two rules of bank taxation were in force in Ohio in 1851— one for the banks of 1845, and the other for those of 1851; and both were “ incorporated banking institutions.” Which of these should furnish the rule for this company? To whom did the choice belong ? The charter is silent upon the subject, and we do not find it necessary, in the view we take of the case, to settle the question.
The whole case is thus made to depend upon the answer to be given to the question, Bid the 60th section of the act of 1845 constitute a contract within the meaning and under the protection of the constitutional provisions relied upon between the state and the banks formed under it, by which the state is bound not to change the mode or amount of taxation therein provided ?
That the state may be a property-holder, and may purchase or sell by contract, or borrow money and employ the personal services of individuals in the accomplishment of its lawful purposes; and that all such engagements, whether ^executed or executory, bind it in the same manner and to the same extent as though made by an individual, and are equally protected by the constitution of the United States, are propositions too reasonable in themselves to be doubted, and too firmly settled by authority ever again to be drawn in question.
No question upon such a contract arises in this case; nor does the much controverted question arise, whether the grant of corporate powers to private corporations may be subsequently altered or revoked in the discretion of the general assembly; and we therefore express no opinion upon it at this time.
The position of counsel for the company is “ that where property by charter or by grant from a state, or by contract made under .a law of a state authorizing it, is exempted from taxation, or a limited taxation is thereby prescribed, then, in case of exemption, it can *492 not be taxed ; nor, if limited, can it be taxed otherwise than authorized by the terms of the limitation.” In short, the legislature •of 1845 had the power, and have exercised it, to limit the right and to release in part from the burden of taxation imposed upon other property, money invested in these banks during the continuance of their charters ; and this limitation is binding, not only upon all succeeding legislatures, but also upon the people themselves, in the ■reconstruction of the fundamental laws of the state. Bid that legislature attempt this ? And, if so, had they the power to make it ■effectual ? To answer in the affirmative we must find terms sufficiently strong to indicate such an intention used between parties ■competent to contract and in relation to a lawful subject-matter of ■contract.
1. The first question involves a construction of the section quoted, In the light of the balance of the enactment, and with reference to fax laws then existing. This act, embracing seventy-five sections, is very far from being confined to the creation of companies and •conferring corporate powers. It undertakes to regulate the whole business of banking in the state, and to prescribe the duties and •ohligations of those engaging in it. It not only determines the amount to be ^contributed for taxes, but also defines and punishes sundry offenses with imprisonment in the penitentiary. It thus covers ground properly belonging to revenue laws and the •penal code. To assert that all these multiplied regulations, civil and criminal, of a great branch of business, belonged to the unalienable franchises of those banks would be simply absurd.
It is not denied, and certainly can not be, that laws were in force at the time the act of 1845 was passed, which, if it had been silent upon the subject, would have subjected the banks formed under it, or the stock held in them, to taxation in common with ■other property.
With these materials for properly construing the sections in view, the principles by which we should be guided have been very clearly settled by the supreme court of the United States. A grant from the government is claimed; not a grant of property, but a surrender of sovereign power. In Providence Bank v. Billings, 4 Pet. 561, where the same claim was made and disallowed, Chief Justice Marshall, delivering the unanimous opinion of the court, says: That the taxing power is of vital importance—that it is essential to the existence of governments—are truths which it can not be *493 necessary to reaffirm. They are acknowledged and asserted by' all. It would seem that the relinquishment of such a power is-never to be assumed.”
We will not say that a state may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it-undiminished,” that community has a right to insist that its abandonment ought not to be presumed in a case in which the delib-erate purpose of the state to abandon it does not appear.”
“Any privileges which may exempt it (the corporation) from. the burdens common to individuals, do not flow necessarily from the charter, but must be expressed in it, or they do not exist.”
*In the case of The Stourbridge Canal v. Wheely, 2 Barn. & Ad. 793, quoted and approved in Charles River Bridge v. Warren Bridge, 11 Pet. 544, it is said: “ This, like many other cases, is a-bargain between a company of adventurers and the public, the-terms of which are expressed in the statute; and the rule of construction in all such cases is now fully established to be this: ‘ that-any ambiguity in the terms of the contract must operate against-the adventurers, and in favor of the public; and the plaintiffs can claim nothing that is not clearly given them by the act.’ ” And Chief Justice Taney in the latter case affirms this rule of construction to be well settled, both in England and by the decisions-of our own tribunals. And he very pertinently adds : “ It would present a singular spectacle, if, while the courts in England are restraining, within the strictest limits, the spirit of monopoly, and exclusive privileges in nature of monopolies, and confining-corporations to the privileges plainly given to them in their charters, the courts of this country should be found enlarging those-privileges by implication, and construing a statute more unfavorably to the public, and to the rights of the community, than would, be done in a like case in an English court of justice.” In this case, a surrender of the right of eminent domain was claimed upon the-ground that it might be, and had been so used as to destroy the value of the franchise granted to the c.orporation. The case of Providence Bank v. Billings was considered as settling the principle adversely to the claim; and, in respect to it, the chief justice remarks : “It may, perhaps, be said that, in the case of the Providence • Bank, this court were speaking of the taxing power, which is of vital importance to the very existence of every government. But *494 the object and end of all government is to promote the happiness and prosperity of the community by which it was established, and it can never be assumed that the government intended to diminish its power of accomplishing the end - for which it was created.” “A state ought never to be presumed to surrender this, power, ■because, like the taxing power, the whole community have an ^interest in preserving it undiminished.” “ The continued existence of a government would be of no great value if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to the hands of privileged corporations.” “ Whenever any power of the state is said to be surrended -or diminished, whether it be the taxing power or any other affecting the public interest,- the same principle applies, and the rule of -construction must be the same.” “While the rights of private property are sacredly guarded, we must not forget that the com. munity also have rights, and that the happiness and well-being of every citizen depends on their faithful preservation.”
The admirable clearness and force of these extracts leave nothing to be added, except to say the same rule of construction has 'been repeatedly adopted and applied by the courts of this state. Bank of Chillicothe v. Swayne, 8 Ohio, 286; Ohio v. Granville Alexandrian Society, 11 Ohio, 12; Kemper v. Turnpike Co., Id. 393.
Governed by this settled rule of construction, we proceed to ap: •ply it to the section of the act of 1845 relied upon. It must be .admitted the section contains no language importing a surrender ■ of the right to alter the taxation prescribed, unless it is to be inferred from the words, “shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned •therein, would otherwise be subject; ” and it is frankly conceded that if these words had occurred in a general law, they would not be open to such a construction. If the place where they are found ■is important, we have already seen this law is general in many of its provisions, and upon a general subject. Why may not this be classed with these provisions, especially in view of the fact that, in its nature, it properly belongs there ? We think it should be, and regarded as a law prescribing a rule of taxation until changed, and not a contract stipulating against any change; a legislative command, and not a legislative compact, with these institutions.
*The taxes required by this act are to be,“in lieu of” *495 •other taxes: that is, take the place of other taxes. What other taxes? The answer is, such as the banks or the stockholders 11 would otherwise be subject” to pay. The taxes to which they would otherwise be subject were prescribed by existing laws ; and this, in effect, operated to repeal them, so far as these institutions were concerned. This is the natural and obvious application of the language, and is the same language, used for the same purpose, in ■the act of 1851. That the general assembly intended only this, and • did not intend it to operate upon the sovereign power of the state, or to tie up the hands of their successors, we feel well assured. To suppose the contrary, would be to impeach them of gross violation of public duty, if not usurpation of authority. The taxes imposed were, at the time, much less than those imposed upon other property less profitably employed; and this disproportion has been growing greater every year, without the least expectation of any diminution during the continuance of these charters. That a body of men, representing the whole people, and all interests, deliberately intended, without one dollar of consideration paid to the ■state, to perpetuate this inequality, and to continue such marked injustice, beyond the power of remedy, for twenty years, ought not to be believed without the most cogent evidence. If they had so intended, it would never have been left by the able and experienced men at whose instance the law was enacted, to be made out by dubious and uncertain construction. Our legislation has furnished numerous examples, with which they were very well acquainted, of attempts to limit the taxing power; but in all of them plain and unequivocal language, admitting of no construction, has been used. A single example will serve to illustrate them all. By the 42d section of the act of 23d February, 1816, to “ incorporate certain banks therein named,” 2 Chase, 925, it is declared that the banks therein named, accepting and complying with the provisions of the act, “ shall be and remain exempt and free from the payment of any tax to be imposed and collected by any other law of this state.”
*If this construction of the section should not be deemed conclusively correct, still candor must compel the admission that it is at least doubtful, if it is not; and that the deliberate purpose of the state to abandon this vital right does not clearly and unequivocally appear. If even this is so, the law compels us to re *496 solve all doubts in favor of the public, and to hold that the exemption does not exist.
No case has been cited, and we hazard nothing in saying none-exists, in which language so inconclusive and uncertain has been held to effect a surrender of this right; xtnless the case of The State v. The Commercial Bank of Cincinnati, 7 Ohio, pt. 1, 125, should be thought to be an exception. But this decision has not been regarded, by at least one-half the court that made it, as a correct exposition of the law, and, with the utmost respect for that court, is not so regarded by us.
The answer thus given to the first question propounded, finding-no attempt to surrender the taxing power over these institutions,, decides this case, and renders it strictly unnecessary to consider the-last. But as that, also, has been discussed and considered, and involves considerations of great importance, we do not deem it improper to express our views upon it.
2. The remaining question, more fully stated and directly applied, is this : Had the general assembly jDower, under the constitution then in force, permanently to surrender, by contract, within-the meaning and under the protection of the constitution- of theTJnited States, the right of taxation over any portion of the property of individuals, otherwise subject to it?
Our observations and conclusions upon this question must betaken with reference to the unquestionable facts that the act of 1851 was a bona fide attempt to raise revenue by an equal and uniform tax upon property, and contained no covert attack upon the franchises of these institutions. That the surrender did not relate to property granted by the state, so as to make it a part of the grant for which a consideration *was paid, the state having-granted nothing but the franchise, and the tax being upon nothing' but the money of individuals invested in the stock; and that no bonus or gross sum was paid in hand for the surrender, so as to-leave it open to controversy that reasonable taxes, to accrue in future, were paid in advance of their becoming due. What effect a. different state of facts might have, we do not stop to inquire. Indeed, if the attempt has here been made, it is a naked release of sovereign power, without any consideration or attendant circumstance to give it strength or color; and, so far as we are advised, is-the first instance where the rights and interests of the public have been entirely overlooked.
*497 Under these circumstances, we feel no hesitation in saying the general assembly was incompetent to such a task. This conclusion is drawn from a consideration of the limited authority of that body, and the nature of the power claimed to be abridged.
That political sovereignty, in its true sense, exists only with the people, and that government is “ founded on their sole authority,” and subject to be altered, reformed, or abolished only by them, is a. political axiom upon which all the American governments have been based, and is expressly asserted in the bill of rights. Such of the sovereign powers with which they were invested as they deem necessary for protecting their rights and liberties, and securing their independence, they have delegated to governments created by themselves, to be exercised in such manner and for such purposes as were contemplated in the delegation. A part of this power has been delegated to the federal and a part to the state governments ; neither is thereby made sovereign or independent; but they are strictly dependent and subordinate organizations. That these powers can neither be enlarged nor diminished by these repositories of delegated authority, would seem to result inevitably from the fundamental maxim referred to, and to be too plain to need argument or illustration. If they could be enlarged, government might become absolute. If they could be diminished or abridged, *it might be stripped of the attributes indispensable to enable it to accomplish the great purposes for which it was instituted. And in either event the constitution would be made either more or less than it was when it came from the hands of its authors ; being changed and subverted without their action or consent. In the one event its power for evil might be indefinitely enlarged ; while in the other its capacity for good might be entirely destroyed, and thus become either an engine of oppression, or an instrument of weakness and pusilanimity.
The government created by the constitution of this state, although not of enumerated, is yet one of limited powers. It is true the grant to the general assembly of “ legislative authority” is general -f but its exercise within that limit is necessarily restrained by the previous grant of certain powers to the Federal government, and by the express limitations to be found in other parts of the instrument. Outside of that boundary it needed no express limitations, for nothing was granted. Hence this court held, in Cincinnati, Wilmington, etc. R. R. v. Clinton Co., ante 77, that any act passed *498 by the general assembly, not falling fairly within the scope of “ legislative authority,” was as clearly void as though expressly prohibited. So careful was the convention to enforce this principle, and to prevent the enlargement of the granted powers by construction or otherwise, that they expressly declared in art. 8, section 28: “ To guard against the transgression of the high powers we have delegated, we declare that all powers not hereby delegated remain with the people.” When, therefore, the exercise of any power by that body is questioned, its validity must be determined from the nature of the power connected with the manner and purpose of its exercise. What, then, is the taxing power ? And to what extent, and for what purposes has it been conferred upon the legislature ? That it is a power incident to sovereignty—“ a power of vital importance to the very existence of every government”—has been as often declared as it has been spoken of. Its importance is not too ^strongly represented by Alexander Hamilton, in the 30th number of the Federalist, when he says : “ Money is with propriety considered as the vital principle of the body politic; as that which sustains its life and motion, and enables it to perform its most important functions. A complete power, therefore, to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution. From a deficiency in this particular, one of two evils must ensue; either the people must be subjected to continual plunder, as a substitute for a more eligible mode of supplying the public wants, or the government must sink into a fatal atrophy, and in a short course of time perish.”
This power is not to be distinguished in any particular material to the present inquiry from the power of eminent domain. Both .rest upon the same foundation—both involve the taking of private property—and both, to a limited extent, interfere with the natural natural right guarantied by the constitution, of acquiring and enjoying it. But, as this court has already said in the case referred ■to, “ neither can be classed amongst the independent powers of government, or included in its objects or ends.” No government was ■ever created for the purpose of taking, taxing, or otherwise interfering with the private property of its citizens. “But charged with the accomplishment of great objects, necessary to the safety .and prosperity of the people, these rights attach as incidents to to those objects, and become indispensable means to the attainment *499 of those ends.” They can only be called into being to attend the independent powers, and can never be exercised without an existing necessity.”
A single example will illustrate this position. It is sacred duty of government to administer justice, and to facilitate social and business intercourse, by the construction of roads; and these may be classed amongst the great objects of its institution. To accomplish the first, money must be had ; and the last, land in addition. To obtain them, resort may be had to the private property of the citizen, and it may *be taken for either under prescribed regulations. But can it be doubted, if taken in either way, without such legal and clearly-defined object to which to refer it, that the taking would involve a usurpation of authority which would render it illegal.
This view of the nature of these powers enables us to see clearly to what extent and for what purposes they have been delegated by the general assembly.
They have been delegated, so far as was necessary, to accomplish every lawful object with which the government was charged, and for the purpose of attaining its authorized end. They were delegated to be used for these purposes, and these alone. Any control ■over them for any other purpose is beyond the delegation, and an unauthorized assumption of power. To this extent, and no further, have the people assented to interference with absolute dominion over their property.
The whole argument for the company is based upon the erroneous assumption, that while the people “themselves could, by contract, surrender or yield up any portion of their incidental right ■of taxation,” they could and have conferred the same power upon the general assembly. It is not necessary to say what the people might have done ; the question is, what have they done? It need not be doubted that they might have conferred upon that body much more extensive powers over their persons and property than they have done; and it is probably quite as clear that a wiser posterity might correct the indiscretion of their ancestors by a reconstruction of the fundamental law.
To sustain this power in the general assembly would be to violate all the great principles to which I have alluded. It would affirm its right to deal in and barter away the sovereign right of the state, and thereby, in effect, to change the constitution. When the general *500 assembly of 1845 convened, it found the state in the unquestioned' possession of the sovereign right of taxation, for the accomplishment of its lawful objects, extending to “ all the persons and property belonging to the body politic.”
*When its successor convened in 1846, under the same constitution, and to legislate for the same people, if this defense is-available, it found the state shorn of this power over fifteen or twenty millions of property still within its jurisdiction and protected by its laws. This and each succeeding legislature had the-same power to surrender the right as to any and all other prop,-erty; until at length the government, deprived of everything upon-which it could operate, to raise the means to attain its necessary ends, by the exercise of its granted powers, would have worked its own inevitable destruction beyond all power of remedy, either by the legislature or the people. It is no answer to this to say that confidence must be reposed in the legislative body, that it will not thus abuse the power. “ But,” in the language of the court in McColloch v. Maryland, 4 Wheat. 316, “ is this a case of confidence?”'
We are only bound to exercise this virtue within the limits of the powers conferred. As all delegated authority is liable to abuse, a wise people will never part with more than is necessary to secure their happiness and safety; and they should never be presumed to-have conferred a power upon the government not necessary or useful for their purposes, and which may be employed to their destruction as a people. In our opinion, this power has never been, conferred, and its exercise by that body is as clear a departure-from the spirit and terms of the authority granted, as would be the-sale of a chattel by a bailee for hire.
Again, there was nothing in existence to be released or surrendered. Even the naked right can only be called into being when it is needed to attend an authorized object, and then, only to be-used for its accomplishment. It comes into life with the object as-its incident; adheres to it, and ceases with its accomplishment until it is again needed for a like purpose. To separate them is as-impossible as to separate the shadow from the substance; or the-end to be attained from the only means for its attainment.
The same necessity that required the employment of taxation as* a means, when the constitution was formed, Continues with unabated force, and will as long as the government endures. But po necessity or propriety then existed or exists for control over the *501 right, or to use it for any other purpose. And this seems to us to mark very clearly the boundary of power; and to confine it to cases where an obvious connection between the means and the end can be shown, and that the government has power to exercise the right, but no power whatever’over the right itself. This makes the poAver just as broad as the necessity for its employment, and it •denies it only where it might be used, as a weapon of offense, to .subvert the government or invade other fundamental rights. For •every surrender of the right to tax particular property not only tends to paralyze the government, but involves a direct invasion of the rights of property of the balance of the community, since the deficiency thus created must be made up. by larger contributions from them to meet the public demand.
If these views are correct, and we think they are, it appears very ■conclusive that no contract, within the meaning of the constitution, of the United States, abridging the right of taxation, could have been made by the act of 1845, whatever its language might have been. Indeed, we feel very confident that no control over the right of taxation by the states was intended to be conferred upon the general government by the section referred to or any other, except in relation to duties upon imports and exports. It is very manifest, from the history of the times, that if such control had been apprehended the instrument might have met with a very different fate.
After its adoption by the convention, and while it was pending before the people of the several states for ratification or rejection, a multitude of objections to it were started; many of them suggested by ignorance and selfishness, and among others the apprehended conflicts that might arise between the federal and state governments in the exercise of this right. This objection, if well founded, was felt to be a formidable one by the friends of the constitution ; and Whence Hamilton devoted to its refutation several numbers, in the series of able and patriotic essays written by him and afterAvard collected in the Federalist. This author, who, as remarked by Mr. Justice Thompson in Weston v. City of Charleston, 2 Pet. 476, “has seldom been charged with surrendering any power that can be brought fairly within the letter or spirit •of the constitution,” in the 32d number uses this strong and ■emphatic language:
“ I am willing here to allow, in its full extent, the justness of the *502 reasoning which requires that the individual states should possess-an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. And, making this-concession, I affirm that with the sole exception of duties on imports- and exports, they would, under the plan of the convention, retain that authority in the most absolute and unqualified sense; and that an attempt, on the part of the national government, to-abridge them, in the exercise of it, would be a violent assumption of power unwarranted by any article or clause of its constitution.”
It may well be assumed that the positive declarations and cogent reasoning of this eminent man did much to allay all apprehension upon this subject by the American people. If it be said the state-is only abridged in its exercise where she has herself surrendered the right and is guilty of bad faith in disregarding it, I inquire by what “article or clause” of the constitution of the United States she has conferred upon the general government, or any department of it, the right to judge of the fact of surrender, its validity, and the breach, which must of necessity precede the exercise of control ? If this right exists, the federal government is supreme over the subject and the state subordinate; no longer exercising “ uncontrollable ” authority over a matter purely domestic, with which the other states can bave no concern, and vital to her existence. In such matters, within her exclusive authority, she has not, committed the keeping of her faith either to this court or.the federal government. Nor was there any propriety in her doing-so. If the time shall *ever come when the people of the states become unmindful of the obligations of honor, justice and good faith, to all classes of their own people, there can be very little hoped from the controlling action of a larger government, founded,, sustained and controlled by their sole authority. If corruption ever seizes upon the pillars of the national edifice, its overthrow becomes inevitable.
The clause prohibiting the states from passing laws, “ impairing, the obligation of contracts,” was inserted to suppress an evil which had been extensively felt, of interference between debtor and creditor, and for reasons national in their character. Commerce must of necessity, to a great extent, be general amongst the states ,and its instruments, contracts, equally so. To protect the whole, therefore, from the injurious action of any one member of the confederacy, became a matter of obvious propriety, if not necessity. But *503 •we can not bring ourselves to believe that the great sovereign right of taxation by the states was understood, by any considerable number of the convention that framed, or of the states that adopted that instrument, to be included in the well known and clearly defined term, “ contracts; ” or that any power of control over the exercise of this right was intended to be conferred upon the federal government. And in perfect accordance with this conclusion is-the opinion of the court delivered, by Chief Justice Marshall, in Dartmouth College v. Woodward, 4 Wheat. 518, where it is said-. “ That the framers of the constitution did not intend to restrain the-states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is-not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice.”
It is upon this ground, and this alone, that acts of incorporation have been held, whether correctly or not, to be contracts and irrevocable. They have been considered as grants *of franchises, and, as stated by Mr. Justice Daniel, in West River Bridge Co. v. Dix, 6 How. 535, “A franchise is property and nothing more; it is incorporeal property, and is so defined by Justice Blackstone, when treating in his second book, chap. 2, page 20, of the rights of things. It is its character of property only which imparts to it value, and alone authorizes in individuals a right of action for invasions or disturbances of its enjoyment.” By referring to the same authority cited by the learned judge, we find a franchise defined to be “ a royal privilege or branch of the king’s prerogative, subsisting in the hands of a subject,” and it is added: “Being therefore derived from the crown, they must arise from the king’s grant, or in some cases may be held by prescription, which, as has been frequently said, presupposes a grant.” And from the same source we learn that the king alone, in virtue of his royal prerogative, can create corporations. Now, it will hardly be contended that the right of taxation, by the British constitution belonged to the king’s prerogatives. Two revolutions in that kingdom, induced to a great extent by an- attempted unconstitutional exercise of it, and in which one king paid the forfeit with his life, and another by the loss of his-kingdom, have established this great power, even there, to belong to the reserved rights of Englishmen.
*504 Indeed, the boasted omnipotence of a British parliament would be inadequate to do what is here claimed to have been done by the general assembly of republican states; it being an established maxim, that “ acts of parliament derogatory from the power of subsequent parliaments, bind not,” 1 Bla. Comm. 90. And while ii is true that safe parallels can not often be run between that body and the legislative bodies of these states, yet the reasons given for the rule, that parliament is always of equal authority, and that to allow one parliament to derogate from the power of subsequent parliaments would imply a superiority which does not exist, are equally as- applicable here as there.
^Proceeding upon a similar principle, and one having a very important bearing upon the general merits of this inquiry, the supreme court of the United States in Young v. Bank of Alexandria, 4 Cranch, 396, and Bank of Columbia v. Okely, 4 Wheat. 235, has held that provisions in acts of incorporation, providing -summary remedies for the enforcement of their debts, are “ no part of their corporate franchises, and may be repealed or altered at pleasure by the legislative will.” And for the reason as stated by ■the court in the latter case, that “ the forms of administering justice, and the duties and powers of courts, as incident to the exercise of a branch of sovereign power, must ever be subject to legislative will, and the power over them is unalienable, so as to bind -.subsequent legislatures.” These cases must be regarded as having settled that sovereign power can not be made a part of the franchises of corporations, and that it can not be parted with by one legislature so as to bind its successors. These principles, carried "to their legitimate results, will be found to sustain in their full extent every conclusion to which we have arrived.
But it is claimed that these positions have all been settled adversely to our holding by the supreme court of the United States While I do not contend that our views have all been sustained by that court by direct decisions, I think a careful examination will show that no case decided by it conflicts with the conclusion to which we have arrived in this.
So far as analogy is to be drawn from the right of eminent domain, and I think it perfect, its decisions must be regarded as having gone very nearly or quite as far as we have gone in the application of like principles to the right of taxation. In Charles River Bridge v. Warren Bridge, before cited, it was virtually held that the *505 •'legislature of a state might supersede a ferry right, granted to a ■company, by authorizing a bridge company to build a bridge in the •same place ; and might, in effect, supersede the bridge by constructing a free bridge in the same line of travel. In the case of the West River Bridge, the direct question was «presented, whether property taken by right of eminent domain, by a company ito construct a bridge, as well as the franchises of the company, were subject to be taken by a further exercise of that right by the -state; and it was held they were. Mr. Justice Daniel, who delivered the opinion of the court, says; “ No state, it is declared, shall pass a law impairing the obligation of contracts, yet with this con-session constantly yielded, it cannot be justly disputed that in every political sovereign community there inheres necessarily the right .and the duty of guarding its own existence, and of promoting the interests and welfare of the community at large. The constitution of the United States, although adopted by the sovereign states of this Union, and proclaimed in its language to be the supreme law for their government, can by no rational interpretation bo brought to conflict with this attribute in the states; there is no express delegation of it by the constitution, and it would imply an incredible fatuity in the states to abscribe to them the intention to relinquish the power of self-government and self-preservation.” And Mr-Justice McLean remarks : “ The only reasonable result, therefore’ to which we can come, is, that the power in the state is an independent power, and does not come within the class of cases prohibited by the constitution.”
Justice Woodbury, differing in some respects from a majority of the court, but concurring in the decision, said : “ I take the liberty to say, then, as the cardinal principle involved in this case, that in my opinion all the property in a state is derived from or protected by its government, and hence is held subject to its wants in taxation, and to certain important uses both in war and peace.
“ I concur in the views of the court, that it [the eminent domain] still remains in each state of the Union, in a case like the present, having never been granted to the general government, so far as respects the public highways of. a state, and that it extends to the taking for public use, for a road, any property in the states suitable and necessary for it.'”
*And this decision is in perfect accordance with numerous *506 cases in the state courts. 3 Paige, 45 ; 23 Pick. 361; 17 Conn. 454; 8 N. H. 398; 10 Id. 371.
It is true, in this case, no attempt to surrender the right of eminent domain had been made by the state further than might be implied in the original grant; but, if these doctrines are correct, they tend to the conclusion that absolute dominion over the whole-subject is left with the states, and not an argument can be advanced or a reason given in their support that will not apply with still greater force to the right of taxation.
But two cases, so far as we are advised, have been decided by that court in which the right of taxation by the states has been, controlled, upon the' ground now asserted. They are Wilson v. New Jersey, 7 Crunch, 164, and Gordon v. Appeal Tax Court, 3 How. 133. In making this statement, I do not overlook the cases of McColloch v. Maryland, 4 Wheat. 316 ; Osborn v. Bank of United States, 9 Wheat. 738; Weston v. City of Charleston, 2 Pet. 449 ; and Dobbins v. Comm’rs of Erie County, 16 Pet. 435. These cases-were all decided upon the sole ground that each involved an attempt by a state to tax the means employed by the general government to execute its constitutional powers, and, of course, have-no bearing upon the present inquiry.
The New Jersey case arose out of transactions which took place “before the revolution between the then colony and a tribe of Indians, by which a tract of land was conveyed to them by the colony with the privilege of exemption from taxation, in consideration of the relinquishment on their part of extensive claims to lands in other parts of the colony. This was hold to be a valid contract, within the meaning of the constitution, and the exemption enforced in favor of the grantees of the Indians.
The ground upon which this decision was made, as stated in Armstrong v. Treasurer of Athens County, 16 Pet. 290, was that the parties were competent thus to contract, as no restriction was imposed on the colonial government, and the ^consideration was ample for the exemption.” To make that case, where the exemption was made a condition in the sale of land, for a full consideration, by a government without restriction, a precedent for this,, where no property was bought or sold, no consideration paid, and the exemption, if made, made by a legislative body sitting under a written constitution with limited powers, would be altogether inadmissible. That this case was not regarded by the bar or bench *507 as settling the power of legislative bodies under such constitutions, to surrender the right of taxation, is sufficiently evident from the fact that the question was afterwards several times raised and argued by eminent counsel, and was spoken of, although not decided, with very great caution by the court.
In Gordon’s case, for some reason, the question was not raised or discussed either by counsel or the court, although it might be said to be necessarily involved. The power to tax, and the right to limit the power were both admitted by counsel and taken for granted in the consideration of the case. In this case, a very large consideration had been paid for the extension of the franchises and the exemption of the stock from taxation ; and the legislature had expressly pledged the faith of the state “ not to impose any further tax or bonus on the said banks during the continuance of their charter under this act.” If, under these circumstances, this case can be regarded as an authority upon the question of power, and of the right of that court to control the states in the exercise of the right of taxation, it must have proceeded upon the ground suggested by Chief Justice Marshall in the Providence Bank case, “ that a consideration sufficiently valuable to induce a partial release of it ” did exist. This circumstance, connected with the express pledge given, distinguishes the case so completely from this, as to destroy its value as a controlling authority. Finding no case, therefore, in the federal court decisive of this, we have felt at liberty to consider it upon principle ; and we are the better assured in our views from finding them substantially sustained by two of the state courts of high authority. 10 Barr, 449; 10 N. H. 138; 11 Id. 19.
*The considerations above expressed, arising upon the claim made under the act of 1845, also express my opinions upon the same questions presented in the cases of Mechanics’ & Traders’ Bank v. Henry Debolt; Bank of Toledo v. Bond et al., and Treasurer of Miami County v. Piqua Branch of the State Bank; heard and considered in connection with this case; and for the reasons here given, I fully concur in the several decisions made in these cases.

Decree for complainant.

Thurman, J., did not sit in this case.