44 U.S. 133 (1845)
3 How. 133
SAMUEL GORDON, PLAINTIFF IN ERROR,
v.
THE APPEAL TAX COURT.
JAMES CHESTON, PLAINTIFF IN ERROR,
v.
THE APPEAL TAX COURT.
Supreme Court of United States.

*137 Meredith and Dulany, for the plaintiffs in error.
Nelson, attorney-general, and Steele, for the defendants.
*144 Mr. Justice WAYNE delivered the opinion of the court.
The question raised in this case by the agreed statement of facts upon the record, is, Does the act of Maryland of 1841, chap. 23, so far as it imposes a tax upon the shares of stock held by stockholders in the Union Bank of Maryland and the other banks mentioned in the statement, impair the obligation of a contract?
The banks are classified in that statement as the old and the new banks. The old are those which were chartered previous to the year 1821; the new, those which were chartered after the year 1830.
Their exemption from the tax imposed by the act of 1841 is claimed under the acts of Maryland of 1821, chap. 131, and that of the 19th March. 1835, chap. 274, called the act of the session of 1834.
*145 It is admitted that the old banks accepted and have complied with the terms and conditions of the act of 1821; that they also accepted and have complied with the provisions of the act of 1834; and that taxes have always, since the incorporation of the banks, been assessed and levied upon their real and personal property in all the cities and counties of the state, in the same manner as upon property of the same kind belonging to individuals, and that they have always been paid by the banks up to this time.
The question, however, which this court is called upon to decide, and to which our decision will be confined, is, Are the shareholders in the old and the new banks liable to be taxed, under the act of 1841, on account of the stock which they own in the banks?
The statement given by the reporter of the acts of the legislature of Maryland, by which the charters of the banks have been extended at different times, makes it unnecessary to refer to them in detail here.
Are the old banks in Baltimore and their stockholders exempted from further taxation during the continuance of their charters under the act of 1821, chap. 131, by force of the 11th section of that act? Can the old banks, after the year 1845, the time to which their charters were extended by the act of 1821, and the new banks, claim any exemption form taxation under the act of 1834, chap. 274, unless it be a tax upon their franchise of banking?
It appears, from the acts of 1812, 1813, and 1821, that the legislatures which passed them had in view the construction of the Cumberland and Boonsborough turnpike roads, and the establishment of a school fund. That they designed to accomplish those objects by making some of the banks construct the roads, and all of them contributors to the school fund, as the price for their charters. A round sum, or an annual charge, with or without reference to capital stock, may be asked by a legislature for such a franchise. It may be more convenient to the banks to have such a consideration or bonus distributed through the years of their corporate existence, than to pay its equivalent in advance. This option was given to the old banks. Being so given, it is conclusive that the legislature intended the annual tax or charge upon the capital stocks of the banks to be the bonus or price, or part of the price as to some of them, that they were to pay for the prolongation of their franchise of banking. When the banks accepted the acts, by choosing to pay the annual charge instead of the stipulated alternative, it is plain that they thought so too, and that they understood in that way the contract between themselves and the state. Either was a condition, to be accepted and complied with before the charters were to be extended. Such a contract is a limitation upon the taxing power of the legislature making it, and upon succeeding legislatures, to impose any further tax upon the franchise. But why, when bought, as it becomes property, may it not be taxed, as land is taxed which has *146 been bought from the state, was repeatedly asked in the course of the argument? The reason is, that every one buys land, subject in his own apprehension to the great law of necessity, that we must contribute from it and all of our property something to maintain the state. But a franchise for banking, when bought, the price is paid for the use of the privilege whilst it lasts, and any tax upon it would substantially be an addition to the price. But whether the bonus for the franchise is paid by an annual tax upon the capital stock, or in any other way, it is in the discretion of the legislature to tax the capital stock as an aggregate, according to its actual value, or the stockholders on account of their separate ownership of it, or the dividends in the aggregate, or the stockholders on account of their portions of them. The limitation and the power to tax, as both have been just expressed, was substantially conceded by counsel on both sides of this cause. We did not understand the counsel for the appellants as contending, that the shareholders in the old banks were exempted from the tax imposed upon them on account of their stock, except by the force of the 11th section of the act of 1821. Their argument was, though the franchise might be taxed separate from the stock of a bank, whether the annual tax paid by the banks upon their capital stock was a tax upon their franchises or not, that the banks were exempted from further taxation; the old banks by force of the 11th section of the statute of 1821, and all of the banks in Baltimore by force of the act of 1834. The argument of the counsel for the defendant in error was, that the annual tax paid by the banks was a tax upon their franchises, and that the 11th section did not give to the stockholders any exemption from being taxed as persons on account of their stock. Whether or not the exemption given by that section is extended to the old and the new banks in virtue of the act of 1834, is another question, to which a separate answer must be given in the course of this opinion.
Has such an exemption been given to the old banks? The language of the 11th section of the act of 1821 is: "And be it enacted, That, upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act." This is the language of grave deliberation, pledging the faith of the state for some purpose  some effectual purpose. Was that purpose the protection of the banks from what that legislature and succeeding legislatures could not do, if the banks accepted the act, or from what they might do, in the exercise of the taxing power? The terms and conditions of the act were, that the banks should construct the road and pay annually a designated charge upon their capital stocks, as the price for the prolongation of their franchise of banking. The power of the state to lay any further tax upon the franchise was exhausted. That is the contract between the state and the banks. If follows, then, *147 as a matter of course, when the legislature go out of the contract, proposing to pledge its faith, if the banks shall accept the act, not to impose any further tax or burden upon them, that it must have meant by those words an exemption from some other tax than a further tax upon the franchise of the banks. The latter was already provided against. To confine the pledge to any further tax upon the franchise, surrenders the whole clause as a substantive enactment, to a supposed needless declaration of the legislature, that it would not do what it had stipulated by its contract not to do. The faith of states is never pledged but for some substantial end, within the competency of their legislative power; and it is not for us to suppose that of Maryland was given in the act of 1821, with a less grave intent. "Not to impose any further tax or burden," when used in reference to some tax already imposed, means no other tax besides that to which reference is made. Those words, so used, cannot be limited by a refinement upon the etymology of the word "any," out of or beyond its meaning in common discourse, to any like; and the words "any further tax," used with relation to some other tax, will, by common consent, as it always has been, be intended to mean any additional tax besides that referred to, and not any further like tax.
Having determined that the clause in question was not meant as a pledge against further taxation upon the franchises of the banks, but that it was a pledge against additional taxation, what is the extent of exemption given by it, or to what does it apply? Does it exempt the respective capital stocks of the banks, as an aggregate, and the stockholders from being taxed as persons on account of their stock? We think it does both. The aggregate could not be taxed, without its having the same effect upon the parts, that a tax upon the parts, would have upon the whole. Besides, the legislature, in proposing the terms and conditions of the act, use the word "banks" with reference to the consent or acceptance of the act being given by the stockholders, according to a fundamental article of their charters: The acceptance of the act could only be made by the stockholders. They did accept, and the state recognised it as the act of the stockholders. It could not have been given or been recognised in any other way. True it is, when accepted and recognised, it became a contract with the banks. But its becoming a contract with the banks determines of itself nothing. We must look in what character, or by whose assent it was to become a contract with the state, to ascertain the intention of the legislature in making the pledge, "that upon any of the aforesaid banks accepting of and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act."
The senses in which the words bank or banks are used, occur every day in conversation, and are understood by every one. But *148 the sense in which they are intended to be used, is determined by their connection with what is said besides. When we speak of an act to be done by a bank or banks, we mean an act to be done by those who have the authority to do it. If it be an act within the franchise for banking, or the ordinary power of the bank to contract, and it is done by the president and directors, or by their agent, we say the bank did it, and every one understands what is meant. If, however, an act is to be done relative to the institution, by which its charter is to be in any way changed, the stockholders must do it, unless another mode to effect it has been provided by the charter. In one sense, but after it has been done, we may say the bank did it, but only so because what the stockholders have done, became a part of the institution, which it was not before. The act to be done in this instance was relative to the institution. The legislature knew it could only be done by the stockholders, and it uses the word banks in reference to the act being accepted by the stockholders. The act was accepted by them. When, then, the legislature says, "that upon any of the aforesaid banks accepting of and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act," the relative is as board as the antecedent, comprehending all that the latter referred to. It cannot be said, then, that the stockholders in the old banks are not exempted by the 11th section of the act of 1821 from being taxed as persons, on account of their stock in those banks, during the continuance, of their charters under that act.
Such was manifestly the intention of the legislatures which passed the acts of 1813 and 1821, from their language. It is confirmed by the attendant circumstances. Each of those legislatures were anxious to have a certain road constructed, which they thought the convenience and intercourse of the citizens of Maryland required; and they were also anxious to raise an adequate school fund for every county in the state. They determined that both should be accomplished by incorporating certain banks, with the obligation upon them to make the roads, and to make all the banks in the state pay an annual tax upon their respective capitals, for a school fund, as the conditions upon which their charters were to be extended. By the act of 1813, chap. 122, every incorporated bank in the state was required to pay the annual tax of twenty cents upon every hundred dollars of its capital stock, as the condition upon which its charter was to be extended.
When the legislature, in 1821, incorporated the Boonsborough Turnpike Company, and proposed to extend the charters of those banks which, by the terms of the act, were to subscribe for stock enough to complete the road, it renewed upon those banks the school tax which had been imposed upon them in common with the *149 other banks, by the act of 1813. The 11th sections in both acts are identical. In what spirit were those acts offered to the acceptance of the banks? In what spirit was it that the banks viewed and accepted these acts? It was an unusual way of providing means for the construction of turnpike roads. The tolls might turn out to be enough to compensate them for the expenditures. They might not. Though the legislature thought the construction of the roads and paying the school fund tax were no more than an adequate price for an extended franchise, it is very certain that the stockholders may have thought, that the incorporation of the banks into turnpike companies, with an obligation upon them to withdraw so much money from their business operations as was sufficient to finish the roads, presented only a contingent possibility that they could be remunerated by tolls from the roads. When the act of 1821 was proposed, they had some experience of what had been the result of the construction of the Cumberland road. Is it not possible, then, that when the acts of 1813 and 1821 were in preparation, or as they were being enacted, that the 11th section was introduced as an inducement to the stockholders to accept those acts? Whether the tolls from the road have ever compensated the banks for the expenditure upon them, does not appear in the case. But it was natural that the stockholders, knowing as they did that a tax upon the franchises of the banks would not exempt them form other taxation, stipulated in both instances that a provision should be introduced into the acts surrendering the state's right to tax them further than they were about to be by those acts. In whatever way we examine the acts of 1813 and 1821, we are of opinion that it appears from the 11th sections in those acts, to have been the intention of the legislatures which passed them, to exempt the stockholders from taxation as persons on account of the stock which they owned in the banks. This exemption, however, is limited to the old banks in Baltimore which were chartered before 1821, during the continuance of their charter under the act of 1821. It is founded upon the 11th section of that act, and it is our opinion that the act of 1841, chap. 23, in so far as it imposes a tax upon the stockholders in those banks, on account of their stock, does impair the obligations of a contract, and is void by the 10th section of the 1st article of the Constitution of the United States.
The act of 1834 does not extend to the old or the new banks an exemption from the tax imposed by the act of 1841, chap. 23. It is an act to extend the charters of the several banks in Baltimore. The second section prescribes the terms upon which the franchise for banking is extended. Those terms are the payment annually of twenty per cent. upon every hundred dollars of the respective capitals of the banks, and their proportional parts of $75,000, in two yearly instalments, computed from the passage of the act, according to the combined rates of their respective capitals paid in, *150 and of the time for which their charters are respectively continued beyond the first day of January, 1845.
Upon a failure of any bank to pay either the annual charge or its proportional instalment, its charter is declared null and void. The annual charge and the instalment make the bonus to be paid by each bank for its continued franchise. It was urged for the old and the new banks, that the annual tax which they were required to pay by the second section of the act of 1834 being upon their respective capitals, a tax upon the stockholders on account of their stock would be equivalent to an increase of the price which had been given for the franchise. The effect upon the stockholders would be the same, as they pay both, but that is because they agreed to pay an annual tax upon the capital stock, for their franchise, without any stipulation by the state that they were not to be taxed as stockholders, on account of their stock, as was the case in the eleventh section of the act of 1821. The franchise is their corporate property, which, like any other property, would be taxable,-if a price had not been paid for it, which the legislature accepted, as the consideration for allowing them to use the franchise during the continuance of their charters. The capital stock is another property  corporately associated, for the purpose of banking  but in its parts is the individual property of the stockholders in the proportions they may own them. Being their individual property, they may be taxed for it, as they may for any other property they may own. This is not only the case in Maryland. A franchise for banking is in every state of the union recognised as property. The banking capital attached to the franchise is another property, owned in its parts by persons, corporate or natural, for which they are liable to be taxed, as they are for all other property, for the support of government.
We are of opinion that the stockholders in the old banks are exempt from the tax imposed by the act of 1841, chapter 23, during the continuance of their charters under the act of 1821, but that the stockholders in the old and new banks are liable to be taxed by the act of 1841, or that they can claim no exemption under the act of 1834, by which their charters were further extended.
The judgment of the Court of Appeals is therefore reversed, and the cause will be remanded, with directions to enter up a judgment for the plaintiff in error.