**360**     CASES IN THE SUPREME COURT

State of Arkansas vs. County Court of Crittenden County.     [JANUARY

## STATE OF ARKANSAS VS. COUNTY COURT OF CRITTENDEN COUNTY.

The swamp and overflowed lands, sold by the State, under the provisions of the act of 6th January, 1851, while the 14th section thereof was in force, are by contract between the State and the purchaser, exempt from taxation.

The period of exemption begins at the date of the purchase from the State, and continues for ten years, if the lands are not sooner reclaimed, and if they are, ceases upon their reclamation: and in no event, continues longer than ten years, no matter whether reclaimed or not.

Whenever any of the levees and drains provided for by the act of 6th January, 1851, were completed, the lands, intended to be protected or drained thereby, were' within the meaning of the law, *reclaimed.*

That such lands cannot be taxed until after the expiration of the period of exemption, and so much of the act of 11th January, 1855, as provides that they shall be, is repugnant to the constitution of the United States, and void.

*Appeal from the Circuit Court of Crittenden County.*

Hon. GEORGE W. BEAZLEY, Circuit Judge.

Argued before Hon. E. H. ENGLISH, Ch. J., Hon. C. C. SCOTT, Justice, and Hon. F. W. COMPTON, Special Judge—Hon. THOS' B. HANLY, J., not sitting.

HEMPSTEAD, Sol. Gen., for the appellant.

FOWLER & STILLWELL for appellee.

Hon. F. W. COMPTON, Special Judge, delivered the opinion of the Court.

This was an application by the State to the Court below, for a *mandamus* to the county Court of Crittenden county.

The questions presented are of grave importance, involving,

as they do, the taxing power of the State and the constitutionality of her legislation.

The record shows that a part of the swamp and overflowed lands granted to the State by act of Congress, approved 28th September, 1850, lie in Crittenden county; that pursuant to the provisions of an act of the Legislature, passed 11th January, 1855, the tax assessor of that county, in listing lands for taxation for the year 1856, embraced in the assessment list, swamp and overflowed lands which had been sold by the State, under the provisions of an act of the Legislature, passed 6th January, 1851, and prior to the passage of the act of 1855; that in due time, the assessor returned the assessment list to the county Court for its action; and that the county court refused to receive and act upon the assessment list, so far as it embraced swamp and overflowed lands sold by the State as above mentioned, and refused to assess such lands for taxation, giving as a reason for its refusal, that so much of the act of 1855, as sought to impose a tax on the lands, was unconstitutional and void. That the State then exhibited her application to the Circuit Court for a *mandamus*, to compel the county Court to act in the premises—her application was overruled, and she excepted and appealed to this Court.

To understand correctly the merits of the propositions, which have to be discussed and decided by the court, it is necessary to state some of the provisions of the several enactments out of which they arise.

The act of Congress of 28th September, 1850, granted to the State of Arkansas a particular description or class of lands, for a specified purpose. The lands granted were the whole of the *swamp* and *overflowed* lands within the State, *made unfit thereby for cultivation*, remaining unsold at the time of the passage of the act (sec. 1,) and as a rule for determining what lands were embraced by the grant, the act declared that all legal subdivisions, the greater part of which was " *wet and unfit for cultivation*," should be included, etc., but when a greater part of a

362      CASES IN THE SUPREME COURT

State of Arkansas vs. County Court of Crittenden County.    [JANUARY

subdivision was not of that character, the whole of it should be excluded, etc., (sec. 2.)

The purpose of the grant, as declared in the act, was to enable the State to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, (sec. 1.) And the second section of the act provided that the proceeds of the lands so granted to the State, whether from sale, or direct appropriation in kind, should be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

The Legislature of the State, on the 6th of January, 1851, in pursuance of the act of Congress, passed an act to provide for the reclamation of the swamp and overflowed lands, etc. *Act of* 1850, *p.* 77.

By this act it was provided that a board of swamp land commissioners should be appointed (sec. 1,) whose duty it should be to ascertain the swamp and overflowed lands granted to the State by the act of Congress, etc., (sec. 15;) to fix the price of the lands in their then condition, taking into consideration their locality, and the value that would be added to them by their reclamation, (*sec.* 3;) to determine the locality, extent and dimensions of the necessary levees and drains in order to reclaim the lands (*Ib.;*) and to district and classify the lands, and contract with responsible persons for the making of the levees and drains, (*Ib.*)

And it was further provided that payment for the making the levees and drains should be made in the lands reclaimed, or the proceeds of the sales thereof, at the price previously fixed by the commissioners, or scrip issued by the commissioners representing quarter section tracts, in lieu thereof, to be located upon any of the unsettled swamp and overflowed lands, (*sec.* 4–5;) and that the commissioners should have power to sell any portion of the swamp and overflowed lands for cash, at not less than the price previously fixed by them, but for as much higher price as might be obtained, and to apply the proceeds of such sale to the reclaiming of the lands, (*sec.* 8.)

The 14th section of this act is in the words following:

" That to encourage by all just means the progress and completion of the reclamation, by offering inducements to purchasers and contractors to take up said lands, the swamp and overflowed land shall be exempt from taxation for the term of ten years, or until said lands are reclaimed."

The act of the Legislature passed January 11th, 1855, (*Act of* 1854, *p.* 127,) provides substantially as follows:

SEC. 1. The 14th section of the act of 6th January, 1851, which exempted the swamp and overflowed lands from taxation, etc., is repealed.

SEC. 2. All swamp and overflowed lands which have been, or may hereafter be confirmed to the State, and which *have been,* or may hereafter be *sold or located,* shall be subject to taxation in the same manner as other lands are taxed under existing laws.

SEC. 3. It shall be the duty of the auditor to furnish the tax assessor of each county in the State, a descriptive list of all the swamp and overflowed lands in his county, that *have been sold, located, or otherwise disposed of,* under the laws of this State, showing to whom sold, or by whom located, and the date of the sale, or location—omitting from the lists unconfirmed lands, etc.

SEC. 4. Each assessor shall enter and list the lands, embraced in the list, furnished him by the auditor, for taxation *for each year next succeeding the date of the sale or location,* in the same manner in which all other taxable property is required to be listed and assessed, under existing laws, and shall proceed to collect the taxes so assessed, etc.

It is urged by counsel that this act provides for the taxation of swamp and overflowed lands sold by the State under the provisions of the act of January, 1851, and while the 14th section thereof was in force—thereby impairing the obligation of contracts, within the meaning of the constitution of the United States. That the object of the act of January, 1855, was not only to repeal the law which exempted swamp and overflowed lands from taxation, but was to reach back, and charge such of

them as had been previously sold by the State, with taxes for each year from the date of the sale, and upon which no taxes had been assessed in consequence of the exemption, is too clear to admit of doubt—it is expressly so enacted.

The constitution of the United States declares that no State shall pass any law impairing the obligation of contracts, *Art. I, sec.* 10; and our State constitution sanctions this restriction by declaring that " no law impairing the obligation of contracts shall ever be made." *Dec. of Rights, sec.* 18.

This prohibition on the law making power, is justly ranked among the wisest provisions contained in the Federal Constitution. Without it—private rights would, at all times, be liable to invasion by the enactment of laws consequent upon fluctuating policy, strong passions, and sudden changes; and with it—nothing more is required than the observance of an elevated morality.

Did the purchase of swamp and overflowed lands under the provisions of the act of 6th January, 1851, while the 14th section thereof was in force, constitute a contract between the State and the purchasers, within the meaning of the above clause of the constitution of the United States?

A contract, in legal contemplation, is an agreement between two or more persons, upon a sufficient consideration, to do or not to do a particular thing. 2 *Black. Com.* 446; *Parsons on Cont.* 5. The term is used in the constitution in its well understood legal sense, *Story on Cont., sec.* 1376; and embraces all contracts executed or executory, whether between individuals, or between a State and individuals. See *Fletcher vs. Peck*, 6 *Cranch.* 136; *Green vs. Biddle*, 8 *Wheaton* 92; *Woodruff vs. The State*, 3 *Ark.* 301; *O'Donnell vs. Bailey et al.*, 24 *Miss.* 386.

The act of January, 1851, as has been shown, not only provided for the reclamation of the swamp and overflowed lands, but also provided for their sale, as a means necessary to accomplish that end, and made it the duty of the commissioners to fix the price at which they should be sold. Up to this time, the State had made no provision for the reclamation of her swamp

and overflowed lands; they had been but recently donated to her by the government of the United States, upon trust, that she would appropriate the proceeds of their sale, or the lands in kind, as far as might be required, to their reclamation, by the construction of the necessary levees and drains. The State was interested in the faithful execution of the trust which she had accepted. The reclamation of the lands would enhance their value, and superinduce the settlement and improvement of the vast districts of country in which they were situated; and would ultimately be to her, a fruitful source of revenue and general prosperity. Considerations of this character, it is reasonable to suppose, had much weight with the State, and induced her to make what must be regarded as a standing offer to sell her lands. The State said, in legal effect, that she would sell, for cash or labor performed, swamp and overflowed lands, at such price as her agents (the swamp land commissioners) might fix upon them, and, as an inducement to purchasers, would exempt them from taxation for ten years, or until they were reclaimed. Persons relying on the good faith of the State, purchased the lands upon the terms proposed. Now, what did they get as a consideration for their money or labor? Did they get lands merely? The answer is obvious:—they not only got lands, but, with them, the solemn undertaking of the State that they should be exempt from taxation for the period specified in the act. The argument that this was not a contract, but was a mere inducement held out by the State, is not easily understood, for it may be affirmed, of every contract, that the party offering to make it, held out an inducement to the party who accepted it. Whether the State sold her swamp and overflowed lands too low, or whether the disposition made of them was wise or unwise, are matters which we are not permitted to consider.

But it is insisted that the terms of the offer, made by the State and accepted by the purchasers, are so vague and uncertain that no definite meaning can be attached to them; and it

**366** CASES IN THE SUPREME COURT

State of Arkansas vs. County Court of Crittenden County. [JANUARY

is asked, when does the exemption begin, and how long does it last?

We concede that there is some ambiguity in the phraseology of the 14th section of the act as to the *duration*, but not as to the *existence* of the exemption; and the settled rule of construction is, that privileges and exemptions, granted by the State, are strictly construed; that any ambiguity in the terms of the grant must operate against the grantee, and in favor of the public; and that nothing passes which is not clearly and explicitly granted. *Southbridge Canal vs. Wheely*, 2 *Barn. & Adol.* 793; *Ohio Life Ins. & Trust Co. vs. Debolt*, 16 *How.* 435; *Ohio Bank vs. Knoop, Ib.* 388.

The language, out of which the ambiguity arises, is, "that the swamp and overflowed lands shall be exempt from taxation for the term of ten years, or until said lands are reclaimed." That the exemption begins at the date of the purchase from the State, and continues for ten years, if the lands are not sooner reclaimed, and if they are, ceases upon their reclamation; and, in no event, exceeds ten years, no matter whether reclaimed or not, we hold to be clear and explicit; because, without doing violence to the plain meaning of words, a *shorter* period cannot be fixed, but owing to ambiguity, it is doubtful whether a *longer* one could be. Here the rule of construction, above laid down, applies, and limits the exemption to the shorter period. In this connection, it becomes necessary to ascertain what is meant by the term "reclaimed," and, to do so, we must look to the subject matter of the act in which it was used.

The act provided for the reclamation of the swamp and overflowed lands, and made it the duty of the commissioners "to determine the locality, extent and dimensions of the necessary levees and drains, in order to reclaim the lands" (*sec.* 3): Thus prescribing both the mode and extent of the reclamation contemplated—the reclamation was to be by means of levees and drains, and they were to be such as the commissioners might "determine" to be necessary to accomplish that end.

No other reclamation is mentioned; nor can any other be implied. The Legislature certainly did not mean to leave the question of reclamation an open one, as to each particular tract of land, after the levees and drains provided for had been constructed. Whether all—or what part of the swamp and overflowed lands, can be made fit for successful cultivation, is and must be, in the physical nature of things, matter of doubt and experience. The Legislature provided for a general system of reclamation, and prescribed what should be done. Farther than that, it did not go. The term " reclaimed," then, must be construed to have reference to that general system and standard of reclamation, and to nothing else. Whenever, therefore, any of the levees and drains, provided for by the act, were completed, the lands intended to be protected or drained thereby, were, within the meaning of the law, reclaimed.

Upon the whole, we are clearly of opinion, that the proposition made by the State and accepted by the purchasers, was a contract. There were competent parties, a sufficient consideration, and all the other elements necessary to constitute a valid contract. *Woodruff vs. Trapnall*, 10 *How.* 204; *Fletcher vs. Peck*, 6 *Cranch.* 87; *Woodward vs. Dartmouth College*, 4 *Wheat.* 518; *Charles Bridge vs. Wrrren Bridge*, 11 *Pet.* 420; *New Jersey vs. Wilson*, 7 *Cranch.* 164; *Billings vs. Providence Bank*, 4 *Pet.* 415; *Ohio Life Ins. & Trust Co., vs. Debolt*, 16 *How*, 429; *Union Bank vs. The State*, 9 *Yerg.* 494; *Gordon vs. Appeal Tax*, 3 *How.* 133; *O'Donnell et al. vs. Bailey et al.*, 24 *Miss.* 386; *State Bank Ohio vs. Knoop*, 16 *How.* 377, 384.

The validity of the contract is assailed, however, upon two grounds:

1st. That the 14th section of the act of January, 1851, is repugnant to the constitution of the State, and that the contract, made under its provisions, is void. And,

2d. That the contract was for a partial relinquishment of the taxing power—a power which the State had a right to resume at pleasure, and that the contract, at most, could only operate as an exemption from taxation for such length of time as the

State chose to permit.   We will consider these objections in the order in which we have stated them:

1st.  The provision of the constitution, with which, it is contended, the 14th section of the act of 1851 conflicts, ordains that, " all property, *subject to taxation*, shall be taxed according to its value—that value to be ascertained in such manner as the General Assembly shall direct: making the same equal and uniform throughout the State.   No one species of property, from which a tax may be collected, shall be taxed higher than another species of property of equal value."  *Const. Ark., Art. VII, Title,* REVENUE, *sec.* 2; and the case of *Pike vs. The State*, 5 *Ark.* 205, decided by this Court, is cited and relied on as an authority in point.   While we concede that the decision of the Court, in the case of *Pike vs. The State*, upon the point then in controversy, was correct; we are constrained, after much consideration, to deny the soundness of those views, expressed in the opinion of the Court, which are relied upon as authority in the case now before us.   The question, then before the Court, was, the constitutionality of so much of the Revenue act, approved, and in force March 5th, 1838, as imposed a tax upon improvements on town lots.   That act provided that all lands, lying within the State, claimed or owned by any person or corporation, whether such land had been patented or not, except such as were exempt from taxation, by virtue of the compact between the State and the United States, should be taxed according to their true value, to be ascertained by the oath of the owners, taking into consideration the fertility of the soil, etc., but " *having no reference to the improvements thereon:*" and that " all town lots, *and the improvements thereon,*" should be *taxed* according to their true value, to be ascertained as above mentioned; and the Court said, " that property of every character and description, upon which a State tax may be levied, must be taxed in proportion to its real and true value, and, according to that basis, be made to contribute to the revenue of the State."   To this proposition, which was sufficient to have disposed of the question then before the Court, we yield

our assent. But the Court further said: "that no portion of any distinct genus or species of property, upon which such tax is imposed, can ever be exempt therefrom. Therefore, if such tax be, at any time, laid upon land, no land within the limits of the State, except such as are or may be exempt, by some authority superior to our State constitution, can be legally exonerated from the imposition, and it matters nothing whether the land be situated in a city, town or village, or in one portion of the State or another; because the rule is general and inflexible, comprehending, in such case, all lands subject to the jurisdiction of the State, and liable to be taxed by her authority, etc. This rule, we consider so great and comprehensive as to embrace every description of property upon which a tax may be laid, to raise any portion of the State revenue."

This, we think, is error. Nor were there any facts before the Court, which required the announcement of the doctrine laid down. The facts did not raise a question of *exemption*, but raised one of *valuation*. The statute, the validity of which was questioned, imposed a tax upon lands in town, or town lots, and lands in the country—neither were exempt; and, although the statute required that each should be valued according to the true value thereof, yet it directed that, in estimating the value of the one, improvements should be considered, and, in estimating the value of the other, they should not; the consequence was, that lands in town, or town lots were assessed for taxation, according to one rule of valuation, and lands in the country, according to another; which resulted in a manifestly false valuation of country lands, and a consequent inequality in the burdens of taxation. And this is the ground upon which the case of *Pike vs. The State*, should have been put, and not that the Revenue act of 1838, had imposed a tax upon country lands, and none on the improvements as such. Indeed, it is not easy, in legal contemplation, to perceive a satisfactory distinction between lands and the improvements on the same. In conveyances, the term "land" passes the improvements—both constitute the realty—they are held and

24

enjoyed together, and are inseparable.   Improvements are important ingredients, entering into the value of land, but we are not prepared to admit that they have such a separate existence as that the soil could be taxed, and they made the subject matter of an exemption.

We declare the true rule of construction to be, that the Legislature has the power, under the constitution, to select the objects of taxation, and upon the exercise of this power there is no constitutional restriction.   When the Legislature has selected the objects, then restrictions attach as to the imposition of taxes upon them; and the end intended to be accomplished, is equality and uniformity in the taxation of all the property *taxed*, throughout the State, and not equality and uniformity throughout the State, as to the *whole* of each, or any particular species of property from which objects of taxation may have been selected.   The restrictions relate to the valuation of the property taxed, and to the rate of taxation imposed.   They require all the property selected for taxation to be taxed according to its value, and that the *rate* of taxation imposed, shall not be fixed higher upon the property of one tax-payer than upon that of another, no matter whether the property be of the same, or of different species; and when this equality in valuation and rate, has been observed, it necessarily follows that the taxation of the property *taxed*, is equal and uniform.

This is manifestly the construction which the Legislature has always put upon this clause of the constitution.   The first Legislature which assembled after the adoption of the constitution, and in which were members who had been delegates in the Convention in which that instrument was framed, passed a revenue law which provided that " all horses, mares and neat cattle" under three years of age; " all jacks, jennies and mules" under two years of age; " all slaves" under eight and over sixty years of age; and " all household furniture belonging to any one family," under the value of four hundred dollars, should be exempt from taxation.   And the Legislature has recognized these exemptions from then till now, modifying

them from time to time, and at times, making other exemptions as in the judgment of the Legislature the public interest required. The Legislature is a co-ordinate department of the government, and the construction which it has put upon the constitution, ever since its adoption, ought to have weight, and cause the courts to pause, before they declare the many laws enacted pursuant to that construction, void. For if it is unconstitutional to exempt swamp and overflowed lands from taxation, it is likewise unconstitutional to exempt young negroes, young cattle, churches, grave-yards and the like, because in each case, the property exempt is a *part* of a particular species or description of property, the remainder of which is *taxed*. Both are the same in principle, and both must stand or fall upon the same ground.

It would be strange to suppose, that the framers of our constitution did not mean to give to the Legislature the power to exempt a *part* of any particular description of property, lest, in the exercise of that power, an inequality in the burdens of taxation might be made, and at the same time, meant to give to the Legislature the power to exempt the *whole* of that description of property, for it is plain that the exemption of the *whole* would produce a greater inequality than the exemption of a *part*, by causing the burdens of taxation to fall entirely on those other descriptions of property which might be selected for taxation. If equality was meant, the provision made to secure it, was a most remarkable one. It was, in effect, that the Legislature should not have the power to make the burdens of taxation slightly unequal, but it should have the power to make them greatly so! And yet, the construction contended for by the Court, in the case of *Pike vs. The State*, necessarily runs into this absurdity, because it is there said, that to secure equality, no *part* of any particular species or description of property can be exempt, but that the whole of it may.

It follows from what has been said that the 14th section of the act of January, 1851, is constitutional.

2d. The only question which now remains to be considered

is, whether a subsequent Legislature had the power to impose taxes upon swamp and overflowed lands purchased under the provisions of the 14th section of the act of January, 1851, before the period of exemption provided for in that section, had elapsed.

It is earnestly contended that it did; and the argument relied on, in support of the position is, that, in the nature and structure of our state governments, the taxing power is a prerogative of sovereignty that must, of necessity, be always exerted according to present exigencies, and consequently must, of necessity, continue to be held by each succeeding Legislature undiminished and unimpaired; and that if it be parted with in one instance, it may, by an abuse of power, be parted with in every other, and the State left without the means of raising revenue.

If the principle which this argument asserts has a precedent to warrant it, we can truly say that, after a careful and patient search, we have not met with it.   On the contrary, it has been repeatedly held, by the highest authorities, both State and Federal, and is now settled beyond controversy, that contracts made by a State, exempting property from the imposition of taxes, are valid and binding, and that by the constitution of the United States, such contracts, and the rights of individuals growing out of them, are protected.   See *New Jersey vs. Wilson*, 7 *Cranch* 164; *State Bank of Ohio vs. Knoop*, 16 *How*. 369; *Dodge vs. Woolsey, Ib.* 331–360; *Johnson vs. The Commonwealth*, 7 *Dana* 343; *Bank of Cape Fear vs. Edwards*, 5 *Ire.* 516; *Union Bank vs. The State*, 9 *Yrg*, 495; *Bank Cape Fear vs. Deming*, 7 *Ire.* 55; *Armington vs. Ryegate & Newberry*, 15 *Verm.* 751; *Herrick vs. Randolph*, 13 *Ib.* 530; *Osboone vs. Humphrey*, 7 *Con.* 338; *Parker vs. Redfield*, 10 *Ib.* 490; *Seymour vs. Hartford*, 21 *Ib.* 485; *Atwater vs. Woodbridge*, 6 *Ib.* 230; *Illinois Cent. R. R. Co. vs. County of McLane et al.*, 17 *Ill.* 291; *Gardner vs. The State*, 1 *Zab.* 550; *O'Donnell et al. vs. Bailey et al.*, 24 *Miss.* 386; *State Bank Illinois vs. The People*, 4 *Scam.* 304; *Camden & Amboy R. R. Co. vs. Commissioners of Appeal*, 3 *Har.* 71; *Gordon vs. Ap-*

*peal Tax*, 3 *How.* 133; *Green vs. Biddle*, 8 *Wheat.* 85–88; *Ohio Life Ins. & Trust Co. vs. Debolt*, 16 *How.* 416.

All the authorities here cited, are cases, where, by contract the taxing power of the State was limited in its exercise, or entirely and perpetually relinquished, and in every case it was held that any law passed by the State, impairing the obligations of the contract, was unconstitutional and void.

In the case of *Fletcher vs. Peck*, 6 *Cranch.* 135, decided by the Supreme Court of the United States, Chief Justice MARSHALL, speaking of the power of one Legislature to bind another, says: " The principle asserted is, that one Legislature is competent to repeal any act which a former Legislature was competent to pass, and that one Legislature cannot abridge the powers of a succeeding Legislature. The correctness of this principle," he says, " so far as respects general legislation, can never be controverted. But if an act be done under a law, a succeeding Legislature cannot undo it. When, then, a law is in its nature a contract, a repeal of the law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community."

And in another part of the opinion, he says: " Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the constitution viewed with some apprehension, the violent acts which might grow out of the feelings of the moment, and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the State, are obviously founded on this sentiment: and the constitution of the United States contains what may be deemed a bill of rights for the people of each State. No State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts. A bill of attainder may affect the life of an indi-

vidual, or may confiscate his property, or may do both." In this form, he says, " the power of the Legislature over the lives and fortunes of individuals, is expressly restrained. What a motive, then, for implying in words which import a general prohibition to impair the obligations of contracts, an exception in favor of the right to impair the obligations of those contracts into which the State may enter?"

In the case of the State of *New Jersey vs. Wilson, supra,* decided by the same court, it was held, " that a legislative act declaring that certain lands which should be purchased for the Indians, should not thereafter be subject to any tax, constituted a contract which could not be rescinded by a subsequent legislative act. Such repealing act being void under that clause of the constitution of the United States, which prohibits a State from passing any law impairing the obligations of contracts."

In the case of *State Bank of Ohio vs. Knoop, supra,* recently decided by the same court, this new doctrine was pressed upon the court, and elaborately discussed. And the court after referring to, and approving the cases of *Fletcher vs. Peck, New Jersey vs. Wilson, Gordon vs. Appeal Tax, supra,* and other leading authorities, held that the State of Ohio was bound by the contract, into which she had entered with the Bank, limiting the exercise of the taxing power, and that she could not, by legislative enactment, impair its obligations. The Court says: " The idea that a State, by exempting from taxation certain property, parts with a portion of its sovereignty, is of modern growth; and so is the argument, that if a State may part with this in one instance, it may in every other, so as to divest itself of the sovereign power of taxation. Such an argument would be as strong and as conclusive against the exercise of the taxing power. For, if the Legislature may levy a tax upon property, they may absorb the entire property of the tax-payer. The same may be said of every power where there is an exercise of judgment."

And in another part of the opinion, the Court says: " Having the power to make the contract, and rights becoming vested

under it, it can no more be disregarded nor set aside by a subsequent Legislature, than a grant for land. This act, so far from parting with any portion of the sovereignty, is an exercise of it. Can any one deny this power to the Legislature? Has it not a right to select the objects of taxation, and determine the amount? To deny either of these, is to take away State sovereignty. It must be admitted that the State has the sovereign power to do this, and it would have the sovereign power to impair or annul a contract so made, had not the constitution of the United States inhibited the exercise of such a power. The vague and undefined and undefinable notion that every exemption from taxation, or a specific tax, which withdraws certain objects from the general tax law, affects the sovereignty of the State, is indefensible."

Many other authorities might be cited upon this point, but we deem it unnecessary to do so, as those cited are quite sufficient to show that the question is not now an open one.

Having thus considered all the points raised in the case before us, we are of opinion and do decide:

1st. That the swamp and overflowed lands sold by the State, under the provisions of the act of 6th January, 1851, while the 14th section thereof was in force, are, by contract between the State and purchaser, exempt from taxation.

2d. That the period of exemption begins at the date of the purchase from the State, and continues for ten years, if the lands are not sooner reclaimed, and if they are, ceases upon their reclamation; and in no event, continues longer than ten years, no matter whether reclaimed or not.

3d. Whenever any of the levees and drains provided for by the act, were completed, the lands intended to be protected or drained thereby, were, within the meaning of the law, *reclaimed*. And,

4th. That the lands cannot be taxed until after the expiration of the period of exemption, and so much of the act of 11th January, 1855, as provides that they shall be, is repugnant to the constitution of the United States, and void.

Seeing no error in the record, the judgment of the Court below must be affirmed, with costs, etc.