BOARD OF COUNTY COM'RS OF SANTA FE CO. *v.* NEW MEXICO & S. P. R. CO. (TWO CASES.)

January Term, 1884.

1. TAXATION—EXEMPTION OF RAILROADS—CONSTITUTIONAL LAW.
By the railroad incorporation act of February 2, 1878, § 3, it is provided that, to aid and encourage the construction of railroads, all the property of every kind and description of every corporation formed under that act shall be exempt from taxation until the expiration of six years from the completion of its road. By act of February 12, 1878, this exemption was extended to all corporations organized under the laws of the territory for the purpose of constructing railroads. By act of February 15, 1878, the words "six years from the completion of its road" are defined, and the exemption limited to a period of 12 years from the commencement of its construction. *Held,* that the granting of this exemption from taxation to corporations not organized under the act of February 2, 1878, is not in contravention of Act Cong. March 2, 1867, § 1. forbidding the legislative assemblies of the territories from granting private charters or special privileges.

2. SAME—LEGISLATIVE CONTRACT—VALIDITY.
The offer of this exemption to railroad companies not organized under the act of February 2, 1878, was not a mere gratuity and without consideration, but upon its acceptance, by complying with its conditions by constructing and operating a railroad, it became a binding contract, from which the territory cannot recede

3. SAME—RAILROAD COMPANY—CAPITAL STOCK.
The capital stock of a railroad company is included in the exemption of "all the property, of every kind and description," granted by these acts, and when the conditions are complied with it cannot be taxed during the period specified.

Appeal from district court, First judicial district, county of Santa Fe.

*C. H. Gildersleeve* and *John H. Knaebel,* for the board of county commissioners.

*Henry S. Waldo,* for the railroad company.

BRISTOL, J.   Each of the above entitled causes was instituted in the district court for the First judicial district and county of Santa Fe, by the defendant in error, the New Mexico & Southern Pacific Railroad Company, a corporation organized and existing under the laws of the territory, against the board of county commissioners of said county of Santa Fe, by filing a verified petition alleging the existence of such corporation and the construction of its several lines of railroad in said county, the time of their construction and the several acts of the legislative assembly under which the corporation was organized, and its powers, privileges, and exemptions created; showing also that the capital stock of the plaintiff corporation had been assessed for purposes of taxation for the years 1881 and 1882, and praying for a writ of *certiorari* to said board, commanding them to produce such assessments and all records relating to the same.   All of which was accordingly done, and such proceedings were had in the court below as that after hearing the parties, judgment was entered setting aside and vacating such assessments and for plaintiff's costs.   The case is here on writ of error sued out on behalf of said board of county commissioners.   The questions raised in either case are essentially the same, the only difference being that one covers the assessment for 1881, and the other that of 1882, and such difference as may have been created in the *status* of the plaintiff corporation as to taxation by the act of the legislative assembly on the subject of "revenue," approved March 1, 1882.   The two cases will be considered together and disposed of in the same opinion.

The judgments below in both of the cases are evidently based upon the theory that at the date of each assessment the property or capital stock of the plaintiff corporation covered by the assessments was exempt from taxation under the law.   The plaintiffs in error claim that such capital stock was not exempt from taxation, and assign this as ground of error.   The parties have filed as part of the record an agreed statement of facts in effect as follows:  That the defendant in error on the sixth day of February, 1878, filed its articles of incorporation, and thereby became and was duly organized as a body corporate under the laws then in force; that the object for which said corporation was formed and organized was the construction, maintenance, and operation of lines of railroad and of telegraph, extending from a point in the Raton pass, on the north line of said territory, through the counties of Colfax, Mora, San Miguel, Santa Fe, Bernalillo, Valencia, and a portion of the county of Socorro, to the town of San Marcial, in the last-named county, and for no other purpose whatever; that said corporation did not enter upon the construction of any of its lines of railroad in said territory until the latter part of the year 1878; that the property at any time owned, constructed, operated, or maintained by said corporation is and has been railroad property exclusively; that the only property owned or constructed by said corporation since its organization is the lines of railroad aforesaid, together with rolling stock, depot stations, round-houses, etc. necessary to the equipment and operation of said lines of railroad

and telegraph in connection therewith, except its capital stock, represented largely by the said property; that said lines of railroad and telegraph were constructed by said corporation; and that no part of such lines of railroad or telegraph was so constructed in any part of said territory for the period of six years.

The sole question to be determined is whether, at the time that either of the assessments was made, the property covered thereby was the property of said corporation, and was exempt from taxation under any contract between the territory and such corporation, created by statutory enactment, either in express terms or by necessary implication in law. To determine this question it will be necessary to review all the legislation on the subject.

The first enactment having any bearing on the questions involved is an act of congress approved March 2, 1867, containing the following provisions:

"Section 1. That the legislative assemblies of the several territories of the United States shall not, after the passage of this act, grant private charters or especial privileges, but they may, by general incorporation acts, permit persons to associate themselves together as bodies corporate for mining, manufacturing, and other industrial pursuits." 14 U. S. St. at Large, p. 426, § 1.

Under the restrictive authority conferred by this act the legislative assembly of the territory passed an act, which was approved December 27, 1867, providing as follows:

"Section 1. Corporations for mining, manufacturing, and other industrial pursuits may be formed according to the provisions of this act, such corporations and members thereof being subject to all the conditions and liabilities herein imposed, and to none others."

The act then, in its subsequent sections, provides how such corporations shall be organized and defines their powers, privileges, and management.

Next in order comes an act of congress approved June 10, 1872, amending the aforesaid act of congress of March 2, 1867, and containing the following provision: "That the first section of an act approved March second, eighteen hundred and sixty-seven, * * * so far as it relates to incorporations which have been or which may hereafter be created and organized for the business of mining, manufacturing, or other industrial pursuits, or the construction or operation of railroads, * * * and the colonization and improvement of lands in connection therewith, * * * and for all rightful subject of legislation consistent with the constitution of the United States. under the general incorporation laws of any territory of the United States, shall be construed as having authorized and authorizing the legislative assemblies of the territories of the United States by general incorporation acts to permit persons to associate together as bodies corporate for purposes above named." 17 U. S. St. at Large, 390.

Under the last act of congress the legislative assembly of the territory passed an act which was approved January 5, 1876, amending the first section of the previous act of December 27, 1867, as follows: "That the first section of an act approved December twenty-seventh, eighteen hundred and sixty-seven, entitled 'An act to create a general incorporation act,' etc.,   *   *   *   shall be and hereby is amended so as to read as follows: 'Corporations for mining, manufacturing, or other industrial pursuits, or the construction or operation of railroads,   *   *   *   and the colonization and improvement of lands in connection therewith,   *   *   *. may be formed according to the provisions of this act; such corporations and the members thereof being subject to all the conditions and liabilities herein imposed, and to none others.'" Subsequently, the legislative assembly of the territory passed two acts, both of which were approved January 30, 1872, one of which provided for mortgaging and consolidating lines of railroad, and the other for the exercise of eminent domain in acquiring lands for lines of railroad; neither of which, however, have any bearing on the questions involved in this case.

Such, then, was the condition of the law under which the defendant in error was organized as a body corporate on the sixth day of February, 1878. At this date none of its property, if it had any within the territory, was exempt from taxation.

On the second day of February, 1878, four days prior to the organization of the defendant in error as a body corporate, an act of the legislative assembly was approved. This is a general incorporation act in regard to railroad companies exclusively. It provides, at great length and with minute detail, for the organization of such corporations, their by-laws, election of directors, and their powers and duties, the *status* of corporate stock and its transfer, their corporate powers, the exercise of eminent domain, the regulation and management of their trains, and their privileges and exemptions, etc. Section 3 of chapter 9 of this act provides as follows:

"Sec. 3. To aid and encourage the construction of railroads in this territory, all the property of every kind and description of every corporation formed under this act shall be exempt from taxation of every kind and description until the expiration of six years from and after the completion of its road or roads."

On a subsequent day of the same session an act was passed by said legislative assembly, which was approved the twelfth day of February, 1878, which provides as follows:

"Section 1. That all the powers, privileges, and exemptions conferred upon corporations organized under an act to provide for the incorporation of railroad companies, and the management of the affairs thereof, and other matters relating thereto, approved February 2, A. D. 1878, are hereby conferred upon all corporations, under the laws of this territory, for the purpose of constructing railroads,". etc.

The said act of the second of February, 1878, contains no repealing clause, nor any provisions as to when it should go into effect; but

the legislative assembly, at the same session, passed still another act on the subject of railroad corporations, which was approved the fifteenth day of February, 1878, and provides as follows:

"Section 1. That for the purposes of taxation any railroad or railroads constructed under the provision of an act entitled 'An act to provide for the incorporation of railroad companies and the management of the affairs thereof, and other matters relating thereto,' approved February 2, 1878, shall be deemed and hereby declared to have reached completion, whether at the end of six years from the time of the commencement of the construction thereof the point to which construction has progressed, and to which said road or roads have been put in operation, is the place of destination of said road or roads, as named in the articles of incorporation of the company building or who built the same, or some point intermediate between the *termini* of said road or roads, as named in said articles of incorporation, and that the exemption from taxation for six years from and after the completion of said road or roads provided for in the above-mentioned act shall be understood and intended to be exemption from taxation for six years from and after the completion of said road or roads, as such completion is defined and expressed in this act, and not otherwise. And it is hereby expressly provided that in no event shall any line of railway, or part of any line of railway, or any part or portion of its property, real or personal, privileges, rights, or franchises, be exempt from taxation for a longer period than twelve years from and after the date of the commencement of the construction of such railway or railways.

"Sec. 2. This act shall be construed to go along with as a part of the above-mentioned act, and shall take effect and be in force from and after its passage."

Upon the approval of this act its provisions and the provisions of the act of second February, 1878, at once went into effect. *West Feliciana R. Co.* v. *Johnson*, 5 How. (Miss.) 276.

There can be no doubt as to the real intention of the legislative assembly in passing these several acts of the second, twelfth, and fifteenth of February, 1878. At that time the territory of New Mexico was the most inaccessible portion of the dominion of the United States to enterprise and commerce. Every branch of industry was languishing, as it had been for centuries, for lack of cheap and rapid transportation to the leading marts of the country. To expend millions in constructing long lines of railway to and through this remote region was a hazardous undertaking—an experiment—a venture—which any but the boldest minds would readily shrink from. At that date not a foot of railroad had been constructed anywhere within the borders of New Mexico. It was under this condition of things that the territory, through its legislative assembly, made a bid for railroads under fair and explicit terms, and upon a consideration of great public importance. As plainly as it could be expressed by acts of the legislative assembly the territory said to all railroad corporations

then existing under the laws of the territory, or thereafter to be organized under such laws, that in consideration of the public benefits to be derived from the construction and operation of railroads within the territory, upon the completion of any such railroad by any such corporation, its corporate property therein and connected therewith shall be exempt from taxation for six years after such completion; but in no case to exceed twelve years after the commencement thereof. There was no uncertainty or ambiguity as to the intention, the object, or the terms and conditions of the proposed compact. With this view, the three several acts last aforesaid are to be construed *in pari materia* and as parts of one act; and, considered together, the exemption from taxation applies as well to the defendant in error after the completion of its lines of railway as to any corporation created under the special provisions of the act of second February, 1878.

It is earnestly contended by one of the counsel for plaintiffs in error that any enactment of the legislative assembly that had for its object the bestowal of this exemption from taxation on any railway corporation not organized under said act of second February, 1878, would be especial legislation, conferring special privileges, and therefore repugnant to the aforesaid acts of congress, and void. This view cannot be maintained. Indeed it may well be assumed that it was the intention of the legislative assembly to avoid especial legislation by placing all railway corporations on the same footing as to this exemption, irrespective of the laws under which they had been organized and authorized to construct and operate railways in the territory. To confer this exemption on corporations organized under the act of second February, 1878, and exclude it from all existing railway corporations otherwise organized, might well be considered as conferring special and exclusive privileges by especial legislation, and in conflict with the act of congress. It is evident, therefore, that if the exemption has not been extended to the defendant in error, then no railway corporation operating lines of road in the territory under the act of February 2, 1878, can rightfully claim it, and that this exemption in such case must be considered as an absolute nullity as to all railway corporations alike.

It is further contended, in behalf of the plaintiffs in error, that no contract existed between the territory and the defendant in error whereby such exemption can be sustained; that it was and is a mere gratuity, supported by no consideration, and therefore a *nudum pactum.* If this is true, if it be a gratuity merely, and no consideration as the foundation thereof has passed territory, then it necessarily follows that it is a *nudum pactum,* and no exemption from taxation has accrued under it. In support of the doctrine that this exemption from taxation is a mere gratuity, we are referred as authority to *Tucker* v. *Ferguson,* 22 Wall. 527; *West Wis. R. Co.* v. *Sup'rs,* 93 U. S. 595.

These cases and the one at bar are by no means parallel in prin-

ciple.    In the case of *Tucker* v. *Ferguson, supra,* congress had granted lands to the state of Michigan to be held by the state for the purpose of aiding in the construction of railroads, and to be applied under certain safeguards prescribed in the grant.    The state accepted the grant upon the conditions imposed, and by an act of its legislature vested certain of the lands in a railway company subject to management and disposal by the board of control of the state, in aid of the construction of the company's railways.    Not being authorized to sell the lands under the conditions of the grant before the construction of the railroad, the company issued its bonds, and the lands were mortgaged to trustees with power to sell the mortgaged lands and apply the proceeds to the payment of the bonds.    In this way the money was raised and the railroad was constructed.    Upon the completion of the road but a small portion of the lands had been sold by the trustees, and but few of the bonds had been paid.    In this condition of things—the residue of the bonds remaining unpaid, and the bulk of the lands remaining in the hands of the trustees and unsold—the state taxed them.    It was to avoid the tax on these lands that the suit was brought, it being claimed that the lands were exempt from taxation under a statute then in force, which provided that a certain tax on the railway corporation, a specific annual tax of 1 per cent. on the cost of the road, and reserving a right to impose a further tax upon gross earnings, should be in lieu of all other taxes to be imposed within the state.    But it was held that the lands had been sold within the meaning of the act of congress, and that though the state, while holding the title as trustee of the United States, could not tax them, she could after such title had been conveyed.    It was further held that the tax imposed by the state had reference only to the railroad itself, and had no relation to the lands which were neither necessary nor used in the exercise of the corporation's franchise or in operating its line of railroad.    It was upon this statement of facts that the ruling was made that an agreement by the state to exempt from taxation, when there is no consideration, is a promised gratuity, spontaneously made, and is a "nude pact" which may be kept, changed, or recalled at pleasure.

In *West Wisconsin Ry. Co.* v. *Sup'rs, supra,* the facts and rulings were substantially the same.

The principles of law enunciated in those cases can have no application to the case at bar, and under the particular circumstances attending it we can not concur in the view taken by counsel for the plaintiff in error.

It is true, however, that at the time of the passage of the three several acts of the legislative assembly, in February, 1878, as aforesaid, no valid contract as to this exemption was created.    The defendant in error had just been organized as a body corporate, but there was not at that time any formal acceptance of the conditions of the exemption, nor any promise to construct and operate any lines of railway.    There was no provision in any of those acts for any such

formal acceptance or promise, as there was in *Gordon* v. *Appeal Tax Court,* 3 How. 133. But, as we have already intimated, these several acts were in the nature of a bid on the part of the territory for railroads, with a promise on her part to each and all railway corporations that on condition of their constructing and operating lines of railway within the territory their corporate property therein should be exempt from taxation for six years after completion. It was a proposition in effect extended to all railway corporations to enter into a contract with the territory for this exemption, the consideration being the advantage to be derived from cheap and rapid transit, and the acceptance of the terms being the actual construction of lines of railway. It was on the same principle as a proposed option on the part of the territory. There was nothing to bind the mere option. At any time before acceptance and compliance with its terms it might have been withdrawn; but as soon as accepted and the consideration had passed it would become a completed contract. In the case at bar the actual constructions of its lines of railway by the defendant in error is the consideration on which this contract for exemption is founded. The date of such construction, instead of the date of the corporation's organization, is what must determine the date of the contract and its validity.

It is not, therefore, as contended for by counsel for plaintiffs in error, the mere organization of railway corporations under the act of second February, 1878, or the particular code of by-laws controlling the management of their affairs in all their details, that constitutes the paramount consideration for such exemption from taxation. It is the construction, equipment, and the operating of lines of railway in any efficient manner whereby the public will be benefited by more convenient, cheaper, and more rapid transit for persons and property.

It is further claimed in behalf of plaintiffs in error that the kind of property covered by these assessments is not covered by the aforesaid terms of exemption from taxation. The language of the assessment, as it was determined by the board of county commissioners on appeal, and as it stands for adjudication, is as follows: "The New Mexico & Southern Pacific Railroad Company * * * assessed in the sum of one million dollars, which is the capital stock of said company, as appeared in the articles of incorporation filed in the office of the probate court." While the words of the exemption are: "All the property of any kind and description of every corporation formed under this act shall be exempt from taxation of every kind and description, until the expiration of six years from and after the completion of its road or roads." All the property of a railway corporation, and all the capital stock of the same corporation, for the purposes of taxation, may be considered as convertible terms. The value of one is controlled by the value of the other. Each may be viewed in the light of a representative of the other. Whatever lessens the value of one necessarily depreciates the value of the other. And a tax upon one is practically a tax upon the other.

This principle was enunciated in *Gordon* v. *Appeal Tax Cases, supra.* In that case the legislature by an act had continued the charters of certain banks to a certain specified time, upon condition that they would make a certain road and pay a school tax, which would have exempted their franchises, but not their property, from taxation. But in another clause of the act there was a provision that upon any of the banks accepting of and complying with the terms and conditions of the act, the faith of the state was pledged not to impose any further tax or burden upon them during the continuance of their charters. This was held to be a contract and to exempt, not only their franchises from taxation, but also the stock of individual stockholders. On this point the court (page 147) said: "Having determined that the clause in question was not meant as a pledge against further taxation upon the franchises of the banks, but that it was a pledge against additional taxation, what is the extent of exemption by it, or to what does it apply? Does it exempt the respective capital stocks of the banks as an aggregate, and the stockholders from being taxed as persons on account of their stock? We think it does both."

In *Mayor and City Council* v. *Baltimore & O. R. Co.* 6 Gill, 288, the court of appeals of Maryland, in its opinion on this subject, (page 295,) said: "But it is said that although by the charter of the Baltimore & Ohio Railroad Company its shares of stock may be exempt from all taxation, yet that such exemption in no wise protects from taxation the specific articles of the company. If such specific property be deemed liable to the imposition of taxes, no sufficient reason can be assigned why the franchise should not be subject to a like imposition. It is as much an ingredient in the shares of stock and component part of their value as is any portion of the corporate property of the company; and if, under such an express legislative exemption as that now before us, the one be exempt from taxation, so also is the other. The design contemplated by the legislature in the insertion of this clause of exemption in the act of assembly was to confer a certain substantial, not a nominal, benefit on the stockholders, and to induce capitalists to risk their money in a novel and hazardous enterprise. To impute to the legislature in the case before us an intention to exempt the shares of stock from taxation, and at the same time to reserve the right to tax anything that constituted it a stock and gives to it its value, would be gratuitously to cast an imputation upon the legislature inconsistent with every principle of judicial courtesy." To the same effect is *State* v. *Branin*, 23 N. J. Law, 484, and authorities cited.

This unquestionably is a sound judicial interpretation of a legislative enactment of that kind, and applies with great force to the question now under consideration. At the time the assessment of 1881 was made the revenue act of 1876 was in force, which contained the following provision: "The capital stock and shares of all * * * corporations subject to pay tax in this territory shall be assessed and taxed in the county where the same or the principal office or place of

business thereof may be located. Such assessment shall be made against the corporation, and such corporation shall pay the tax, and may charge the same as expense or to its stockholders, according to their respective shares." While at the time of the assessment for 1882 the revenue act of first March, 1882, was in force, which contains the following provisions: "The property of every  *  *  * corporation must be assessed in the county where the property is situated, and in the name of the  *  *  *  corporation. Such  *  *  * corporation shall pay tax, and may charge the same to its  *  *  * stockholders according to their respective shares. The owner or holder of stock in any  *  *  *  corporation, the entire capital or property of which is assessed, shall not be assessed individually for such stock."

Under the revenue law of 1876 the assessment of the defendant in error for 1881 could not have been made, since under the terms of that act it was not subject to pay tax. And, upon another ground, neither the assessment for that year under the revenue law of 1876, nor for the next succeding year, under the revenue law of 1882, can be upheld, for the reason that prior to either assessment the lines of railway of the defendant in error had been completed. The consideration had been received by the territory; the terms of the compact had been complied with, and in law accepted by the contracting parties; and the territory, if so inclined, was inhibited from enacting any law impairing its obligation. For the territory now to attempt to evade the obligations of this compact is neither wise nor prudent as a measure of public policy. No state can afford to impair its good faith and credit in this way. That "honesty is the best policy" applies with even greater force to states than to individuals. This six years limitation, as to all lines of railway now constructed, will soon expire. By that time the revenue that will be derived from corporate property in railways, and from the advanced values of every other kind of property, indirectly caused by the advent of railways, will have reached a magnitude which otherwise would not have been attained for a century. Under these circumstances, to claim that this exemption is a mere gratuity; that no consideration has been received by the territory, is but the idlest cavil. It may be said that these powerful corporations, after acquiring power, are often oppressive and extortionate; but these are evils which must be overcome, if at all, by some other and more potent means than by attempting to impair the obligations of fair and reasonable compacts legally entered into by and with them.

In the light of these views, we have no hesitancy in saying that to sustain the tax exemption involved in these cases, is but the dictates of sound law as well as of common honesty.

Both judgments affirmed.

BELL, J., concurs.