## Case No. 15,472.

### UNITED STATES ex rel. MERCHANTS' NAT. BANK v. JEFFERSON COUNTY.

[5 Dill. 310; 1 McCrary, 356; 7 Cent. Law J. 130; 6 Reporter, 486; 7 Am. Law. Rec. 154; 2 Tex. Law J. 164; 24 Int. Rev. Rec. 354; 26 Pittsb. Leg. J. 8.] [1]

Circuit Court, E. D. Arkansas. 1878.

MUNICIPAL BONDS—ENFORCEMENT OF JUDGMENT—LEVY OF TAXES COMPELLABLE BY MANDAMUS—OBLIGATION OF CONTRACTS.

1. Where a statute authorizes a county to issue its negotiable bonds, and makes it the duty of the county court "to levy a special tax of sufficient amount to pay the interest and principal of said bonds as the same become due," the power of taxation thus given enters into and becomes a part of the obligation of the contract between the county and every holder of such bonds; and, under the constitution of the United States, this obligation of the contract cannot be impaired or lessened in any degree by the constitution or laws of the state afterward enacted.

[Cited in Board of Commissioners v. King, 14 C. C. A. 421, 67 Fed. 206.]

[Cited in Voorhies v. City of Houston (Tex. Sup.) 7 S. W. 682.]

2. In such case, it is the duty of the county court to levy and cause to be collected a tax sufficient in amount to pay the interest and principal of such bonds as the same mature, and

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 6 Reporter, 486, and 26 Pittsb. Leg. J. 8, contain only partial reports.]

if it does not perform this duty it may be compelled to do so by mandamus.

On the 26th day of October, 1877, the relator recovered a judgment in this court against Jefferson county for $5,120.70 and costs, on negotiable bonds issued by said county in pursuance of the provisions of the act of the general assembly of this state, entitled "An act to authorize certain counties to fund their outstanding indebtedness," approved April 29th, 1873. By the terms of this act the boards of supervisors of the counties named therein were authorized "to issue the bonds of such counties in any sum necessary to pay the outstanding indebtedness of such counties," etc. The bonds were to be made payable in not less than three nor more than ten years, and to bear interest at the rate of eight per cent per annum, payable semiannually. The 5th section of the act declares: "It shall be the duty of the board of supervisors issuing bonds under the provisions of this act, to levy a special tax of sufficient amount to pay the interest and principal of said bonds as the same become due. Such tax shall be collected in the lawful currency of the United States, and shall not be appropriated to any other purpose than that for which it was levied. If any board of supervisors neglect or refuse to levy the tax herein provided for, the holder of any such bond shall have the right to compel such levy by a writ of mandamus," etc. The constitution of the state adopted October 30th, 1874, abolished the board of supervisors, and devolved all their duties and jurisdiction on the county court, and declared they should "be regarded as a continuation of the board of supervisors." Section 23 of schedule to constitution. It also provided that "no county shall levy a tax to exceed one-half of one per cent for all purposes, but may levy an additional one-half of one per cent to pay indebtedness existing at the time of the ratification of this constitution." Article 16, § 9. The act under which the bonds were issued was passed, and the bonds issued, before the adoption of the present constitution. The constitution of 1868, in force at the date of the passage of this act, unlike the present constitution, contained no limitation on the power of taxation for county purposes; any rate was lawful that was authorized by act of the legislature. Upon the relation of the judgment plaintiff, a rule issued, directed to the county judge of the county, requiring him to show cause—if any he could—at a time stated in the rule, why a peremptory mandamus should not issue out of this court requiring the county judge and justices of the peace of the county, composing the county court, for the levy and appropriation of taxes, to convene at the time and place fixed by law for the meeting of said court for the annual levy of the county and other taxes, and, when so convened, to proceed. in conformity to the requirements of the 5th section of the act under which the bonds were issued, to levy a special tax on all the taxable property of the county, payable only in United States currency, sufficient to pay the relator's judgment. This rule was duly served on the county judge. No response to the rule has been filed, and the relator moves for judgment awarding the peremptory writ.

John McClure, for relator.

CALDWELL, District Judge. It is a popular but erroneous opinion that the restriction on the taxing power of counties contained in the constitution of 1874 repeals or annuls the provisions of the act of 1873, making it the duty of the county court to levy a special tax sufficient to pay the interest and principal of the bonds issued under this act, as the same become due.

This erroneous view, in one instance heretofore, occasioned costs and inconvenience, and, to prevent misconception on the subject in the future, it is deemed proper to state, with some fulness, the law applicable to this class of cases.

It has long been settled by repeated decisions of the supreme court of the United States, and of many of the states, that the usual provision contained in acts authorizing counties to issue negotiable bonds, making it the duty of the proper county court, or board, to levy an annual tax sufficient to pay the principal and interest of such bonds as the same fall due, enters into and becomes a part of the obligation of the contract between the county and the holder of the bonds; and the power and duty of the proper county authorities to levy the tax required by the terms of the act authorizing the issue of the bonds cannot subsequently be withdrawn, so long as a single bond remains unpaid.

When bonds are issued under such an act, the act itself becomes a part of the contract, as much so as if it had been written out at length on the face of the bond, and it cannot be repealed or abrogated by any law of the state—neither by act of the legislature nor constitutional provision—until the obligations incurred under it are paid and discharged according to their terms.

The supreme court of the state has recently decided that the act under which these bonds were issued was legally passed under the constitution then in force; that it is a constitutional and valid law, and that a tax levied by the county court to pay the interest on the bonds was a valid and legal tax. Badgett v. Worthen (Nov. term, 1877) 32 Ark. 496.

The constitution of the United States declares that "no state shall pass any ex post facto law, or law impairing the obligation of contracts." Article 1, § 10. And it further declares that "this constitution, and the laws of the United States which shall be made in pursuance thereof, * * shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to

the contrary notwithstanding;" and that "All executive and judicial officers, both of the United States and of the several states, shall be bound by oath, or affirmation, to support this constitution." Article 6.

In this state the public property of the county cannot be sold on execution to pay the debts of the county, and the only mode of discharging such debts is by the levy of a tax on the taxable property of the citizens of the county. It is obvious that the bond of a county would be valueless unless there existed a legal right to require the levy of a tax to pay it; and, as to such contracts, this right is the principal, if not the only, element of their value, and constitutes the vital part of the obligation.

This right, to the full extent to which it was granted by law for this purpose at the date of the issue of the bonds, is protected from invasion or impairment by the constitution of the United States.

In Von Hoffman v. City of Quincy [4 Wall. (71 U. S.) 535], the precise question here involved was presented to the supreme court of the United States, and that court, in an opinion concurred in by every member of the court, said: "When the bonds in question were issued there were laws in force which authorized and required the collection of taxes sufficient in amount to meet the interest, as it accrued from time to time, upon the entire debt. But for the act of the 14th of February, 1863, there would be no difficulty in enforcing them. The amount permitted to be collected by that act will be insufficient; and it is not certain that anything will be yielded applicable to that object. To the extent of the deficiency the obligation of the contract will be impaired; and if there be nothing applicable, it may be regarded as annulled. A right without a remedy is as if it were not; for every beneficial purpose, it may be said not to exist. It is well settled that a state may disable itself by contract from exercising its taxing power in particular cases. It is equally clear that where a state has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. The state and the corporation, in such cases, are equally bound. The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute; and neither the state nor the corporation can any more impair the obligation of the contract in this way than in any other. The laws requiring taxes to the requisite amount to be collected, in force when the bonds were issued, are still in force for all the purposes of this case. The act of 1863 is, so far as it affects these bonds, a nullity. It is the duty of the city to impose and collect the taxes in all respects as if that act had not been passed. A different result would leave nothing of the contract but an abstract right—of no practical

value—and render the protection of the constitution a shadow and a delusion." Von Hoffman v. City of Quincy, 4 Wall. [71 U. S.] 535.

And the doctrine laid down in the case last cited has been reaffirmed in numerous cases. In Riggs v. Johnson Co., 6 Wall. [73 U. S.] 166, 194, Mr. Justice CLIFFORD, delivering the opinion of the court, states the rule in these words: "Where a state has authorized a municipal corporation to contract and to exercise the local power of taxation to the extent necessary to meet the engagements, the power thus given cannot be withdrawn until the contract is satisfied." And this is the settled doctrine of all the courts. City of Galena v. Amy, 5 Wall. [72 U. S.] 705, 709; Rees v. City of Watertown, 19 Wall. [86 U. S.] 107, 120; U. S. v. Treasurer of Muscatine Co. [Case No. 16,538]; 1 Dill. Mun. Corp. § 41, and note; Burroughs, Tax'n, p. 426, § 139; State v. City of Milwaukee, 25 Wis. 122; Western Savings Fund Soc. v. Philadelphia, 31 Pa. St. 175; Beckwith v. English, 51 Ill. 147; Vance v. City of Little Rock, 30 Ark. 440, 441.

It is no answer to say that the present constitution does not utterly destroy the right given by the act under which the bonds were issued—that a limited tax may still be levied. If by any subsequent act of the state the rate could be limited to five mills, it could be limited to one, or taken away altogether. "One of the tests that a contract has been impaired," says the supreme court of the United States, "is that its value has by legislation been diminished. It is not by the constitution to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligations—dispensing with any part of its force. * * * And the test, as before suggested, is not the extent of the violation of the contract, but the fact that in truth its obligation is lessened, in however small a particular." Planters' Bank v. Sharp, 6 How. [47 U. S.] 327.

And the same court, in a recent case, held a provision of the constitution of the state of North Carolina, exempting property from sale on execution, void as to debts contracted before its adoption, and the court, in this case, state the rule to be that "The remedy subsisting in a state when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the state which so affects that remedy as to substantially impair and lessen the value of the contract is forbidden by the constitution, and is, therefore, void." Edwards v. Kearzey, 96 U. S. 595.

Nor does it affect the question that the law of the state impairing the obligation of a previous valid contract is made part of the constitution of the state, not even though congress has authorized and ratified such constitution. On this point the supreme court of the United States say: "Congress cannot,

by authorization or ratification, give the slightest effect to a state law or constitution in conflict with the constitution of the United States. That instrument is above and beyond the power of congress and the states, and is alike obligatory upon both. A state can no more impair an existing contract by a constitutional provision than by a legislative act; both are within the prohibition of the national constitution." Gunn v. Barry, 15 Wall. [82 U. S.] 610, 623; Jefferson Bank v. Skelley, 1 Black [66 U. S.] 436; Dodge v. Woolsey, 18 How. [59 U. S.] 331.

The supreme court of appeals of Virginia, in a recent case, held that the provision of the constitution of that state allowing property to the value of $2,000 to be held exempt from execution for debts contracted before its adoption was in conflict with the constitution of the United States, and void as respects its application to such debts. The court said: "The fact that an enactment tending to impair contracts is embodied in the constitution of a state, does not protect it. The prohibition of the United States constitution is upon the states, irrespective of the form its laws may take or the agencies which enact them. A state has no more power to impair the obligation of a contract by a constitution than by a legislative act;" and the unanimous opinion of the court concludes in language as marked for the force with which it inculcates the moral and social duty of observing the obligation of contracts, both public and private, as for its clear enunciation of the rule of constitutional law applicable to them: "No state and no people can have any real and enduring prosperity except where public faith and private faith are guarded by laws wisely administered and faithfully executed. The inviolability of contracts, public and private, is the foundation of all social progress and the corner stone of all the forms of civilized society where an enlightened system of jurisprudence prevails. Under our system of government it has been wisely placed under the protection of the constitution of the United States, and there it rests, secure against all invasion." The Homestead Cases, 22 Grat. 301.

It is a remarkable fact that this state has, by her legislative enactments and constitutions, contributed largely to the exposition and elucidation of that clause of the constitution of the United States that declares: "No state shall pass any law impairing the obligation of contracts." Among the earliest acts of the legislature of the state was one passed in November, 1836, incorporating the Bank of the State of Arkansas. The 28th section of the act provided "that the bills and notes of said institution shall be received in all payments of debts due to the state of Arkansas." The bank failed in 1839, leaving a large amount of its issues outstanding, which sunk in value until they became almost worthless. It was obvious, if the state kept her pledge, and continued to receive

these worthless bills in payment of debts and taxes due her, no revenue could be collected to support the state government. In this emergency the legislature of the state, on the 10th of January, 1845, repealed the 28th section of the act incorporating the bank, which declared its bills should be received in payment of all debts due the state, and enacted that nothing but current money of the United States should be received in payment of state taxes. Public sentiment, no less than the necessities of the state, seemed to demand this action; and the supreme court of the state held the repealing act valid, and that the state was no longer bound to receive the bills of the bank in payment of debts due her. Woodruff v. Attorney General, 8 Ark. 236.

But the case was appealed to the supreme court of the United States, and that court reversed the judgment of the supreme court of the state, and held that the last act was in conflict with the constitution of the United States, and void, because it impaired the obligation of the contract the state had made, by the terms of the 28th section of the first act, with every one who became a holder of these bills, to receive them in payment of all debts due her; and that a tender of the bills of the bank in payment of a debt due the state after the repealing act was passed was a good and legal tender. Woodruff v. Trapnall, 10 How. [51 U. S.] 203.

Whether the constitution of a state, or an act of its legislature, conflicts with the constitution or laws of the United States, is a federal question, the ultimate and final decision of which, by the constitution and laws of congress, is vested in the supreme court of the United States, whose decision is binding on all other courts, both federal and state. And the supreme court of the state when this cause came before it again, declared "the decision of the supreme court of the United States conclusive upon the point." Woodruff v. Trapnall, 12 Ark. 640. And, as the result of the judgment of the supreme court of the United States, the state was compelled to, and did, redeem this worthless bank paper.

Other legislation of the state in reference to this bank furnishes another illustration of the impotency of state laws to impair the obligation of contracts. The state being the sole owner of the stock of the bank, assumed to herself, by act of her legislature, the right to administer the whole assets of the bank, without regard to the rights guaranteed to the holders of the bills of the bank under the charter. The supreme court of the state maintained the validity of this legislation. State v. Curran, 12 Ark. 321.

But, on appeal to the supreme court of the United States, that court reversed the judgment of the supreme court of the state, and declared such acts of the legislature "impaired the obligation of contracts made with the lawful holders and bearers of bills of the Bank of the State of Arkansas, and so were

inoperative and invalid." Curran v. Arkansas, 15 How. [56 U. S.] 304. And the supreme court of the state gave full effect to the judgment of the supreme court of the United States, and caused it to be carried into execution, its own decision and "the laws of the state to the contrary notwithstanding." State v. Curran, 15 Ark. 20.

In 1851 the legislature of the state passed an act relating to the swamp lands of the state—one section of which provided that, to encourage persons to purchase the swamp and overflowed lands, the same should be "exempt from taxation for the term of ten years, or until said lands be reclaimed." Many persons purchased these lands on the faith of this promise of the state not to tax them for the period named. Public opinion changed, and in 1855 the act which exempted the swamp lands from taxation was repealed, and such lands purchased under the act of 1851 were declared subject to taxation. The supreme court of the state held the act of 1855 was in conflict with the constitution of the United States, and void.

Mr. Justice Compton, who delivered the opinion of the court, said: "The constitution of the United States declares that no state shall pass any law impairing the obligation of contracts. * * * This prohibition on the law-making power is justly ranked among the wisest provisions contained in the federal constitution. Without it, private rights would at all times be liable to invasion by the enactment of laws consequent upon the fluctuating policy, strong passions, and sudden changes; and with it nothing more is required than the observance of an elevated morality." State v. Crittenden Co. Ct., 19 Ark. 360. In this one short sentence the learned judge fully vindicates the wisdom, justice, and necessity of this provision of the constitution of the United States.

Another case afterwards arose under these same swamp land acts. The act of 1851 provided for contracts for the making of levees and drains, and for the payment of contractors in scrip, which it was declared should be received in payment for swamp lands. The 14th section of the same act, as we have seen, exempted swamp lands from taxation for the period of ten years, and this section, as before stated, was repealed by the act of 1855. In this state of the statutes, the question arose whether swamp lands purchased after the repeal of the 14th section, with levee scrip issued before the repeal, were subject to taxation—in other words, whether the repealing act did not impair the obligation of the contract of the holder of the scrip under the first act? The supreme court of the state decided that it did not have that effect, and that the lands were subject to taxation. McGehee v. Mathis, 21 Ark. 40. This case was appealed to the supreme court of the United States, where the judgment of the supreme court of the state was reversed. Chief Justice Chase, who de-

livered the unanimous opinion of the court, said: "The contract of the state was to convey the land for the scrip and to refrain from taxation for the term specified. Every piece of scrip was a contract between the state and the original holder and his assigns. Now, what was the effect of the contract when made? Did it not bind the state to receive the scrip in payment for swamp land, exempted for a limited time from taxation? The scrip, if not receivable for lands, was worthless. To annul the quality of receivability was to annul the contract. But the exemption of the lands for which it was receivable from taxation was a principal element in its value; and repeal of the exemption was the extinction of this element of value. This was clearly an impairment of the contract. The state could no more change the terms of the contract by changing the stipulated character of the land to be conveyed in satisfaction of the scrip as to liability to taxation, than it could abrogate the contract altogether by refusing to receive the scrip at all in payment for land. We are constrained to regard the repeal of the exemption act, so far as it concerns lands paid for, either before or after the repeal, by scrip issued and paid out before repeal, as impairing the contract of the state with the holders of the scrip." McGehee v. Mathis, 4 Wall. [71 U. S.] 143.

The constitution of this state adopted and in force in 1868 declared: "All contracts for the sale or purchase of slaves are null and void, and no court of this state shall take cognizance of any suit founded on such contracts." * * Article 15, § 14. By this provision the framers of that constitution sought to invalidate and destroy the obligation of contracts for the sale and purchase of slaves that were valid contracts under the constitution and laws of the state in force at the time they were made. The effort proved futile. The supreme court of the state declared this section of the constitution of the state impaired the obligation of contracts, and was for that reason in violation of the constitution of the United States, and void; and such contracts were enforced according to their legal effect and obligation under the constitution and laws in force at the time they were made. Jacoway v. Denton, 25 Ark. 625; Sevier v. Haskell, 26 Ark. 133; Pillow v. Brown, Id. 240. And the supreme court of the United States decided the same question in the same way, and for the same reason. White v. Hart, 13 Wall. [80 U. S.] 646.

In no one of the cases cited, in which legislative acts and a section of the constitution of this state were declared to be in conflict with the constitution of the United States, and void, was there a plainer or more palpable violation of that instrument than there is in this case. For when it is said that "to levy a special tax of sufficient amount to pay the principal and interest of

said bonds. as the same become due"—as is expressly required by the terms of the act under which the bonds were issued—will require a levy in excess of the limit allowed by a constitutional provision subsequently adopted, the statement is a confession that this provision of the constitution, when applied to these contracts, impairs their obligation, and is, therefore, so far as it relates to them, null and void.

If a natural person gives his bond agreeing to pay a given sum of money on a day certain, it will not be pretended that the state could, by a law afterwards enacted, extend the time of payment; and if, upon the non-payment of such bond, the holder should put it in judgment, will it be contended that by such a law the state could deny to the judgment plaintiff the right to have execution for his whole debt and to levy upon and sell sufficient property to make it? By the law of this state counties are declared to be bodies "corporate and politic," and endowed with power to contract and to sue and be sued. In this case the county was by law specially authorized to issue these bonds, and to stipulate for payment of the interest and principal at fixed and stated times; and it was made its duty to levy a tax sufficient to meet these payments according to the stipulation of the bonds. Upon what principle can the state, by a subsequent enactment, relieve the county from the obligation to pay the bonds at the time and by the means agreed upon, any more than it could relieve a natural person from the obligation to pay his debt according to the terms of his contract? Confessedly, in the case of a natural person, a state law passed after the debt was contracted, declaring that not more than five mills on the dollar of the aggregate value of the defendant's property should be taken on execution in any one year for its satisfaction, would be a nullity; and if a nullity in that case, why not a nullity in the case of a county? The protection afforded to the obligation of contracts by the constitution of the United States is not limited to the contracts of natural persons, but extends as well to all corporations—public and private —endowed by law with power to contract.

The constitutional limit is applicable, of course, to ordinary county warrants issued prior to the adoption of the constitution. These warrants having been issued for ordinary county purposes, and not under any special act, law, or contract requiring the levy of a tax to pay them, they fall within the provision of the constitution, and a five-mill tax, and no more, may be levied to pay them. And but for this provision in the constitution, it is doubtful what remedy, if any, the holders of these warrants would have had to enforce their payment. U. S. v. Ouachita Co. Ct. [Case No. 14,876], April term, 1876.

If the county court of Jefferson county, or of any other county in this district to whom peremptory writs of mandamus may issue in this class of cases, entertains any doubt as to whether the supreme court of the United States will adhere to its many well-considered judgments, declaring the duty of this court, and of county courts as well, in this class of cases, there is a ready means of settling that doubt. The act of congress gives the county the right to appeal from the judgment of this court awarding the peremptory writ, to the supreme court of the United States; and if the required steps for that purpose are taken within sixty days after the rendition of the judgment awarding the writ, all proceedings under the writ are stayed until the determination of the cause in that court.

That is the only tribunal that can review the judgment of this court; it cannot be reviewed, nor the process upon it enjoined or otherwise obstructed or impeded, by the orders or process of any other court. Riggs v. Johnson Co., 6 Wall. [73 U. S.] 166; Weber v. Lee Co., Id. 211; U. S. v. Keokuk, Id. 514; Supervisors v. Durant, 9 Wall. [76 U. S.] 415; Mayor v. Lord, Id. 409; Amy v. Supervisors, 11 Wall. [78 U. S.] 136; Ex parte Holman, 28 Iowa, 88; Vance v. City of Little Rock, 30 Ark. 452, 453; Brooks v. City v. Memphis [Case No. 1,954]; U. S. v. Silverman [Id. 16,288].

The power of this court to enforce its judgments, in this class of cases, according to the terms of the contract and in the mode authorized by the laws of the state, is not an open question. It would be an anomaly in the judicial system of any government to invest its courts with jurisdiction to hear causes and render judgments, and yet deny to them the power to execute and enforce their judgments. Argument upon this question in this and all other courts was long since foreclosed by the unanimous judgment of the supreme court of the United States. Knox Co. v. Aspinwall, 24 How. [65 U. S.] 377.

And the doctrine established in the case last cited—that the circuit courts of the United States have the power, and that it is their duty, to issue this writ, in this class of cases, to the proper officers of counties, cities, and towns, to compel the levy of a tax, and to enforce obedience thereto—has been reaffirmed by that court in a long line of cases, coming down to a late date. Supervisors v. U. S., 4 Wall. [71 U. S.] 435; Von Hoffman v. City of Quincy, Id. 535; City of Galena v. Amy, 5 Wall. [72 U. S.] 705; Riggs v. Johnson Co., 6 Wall. [73 U. S.] 166; Weber v. Lee Co., Id. 310; Walkley v. City of Muscatine, Id. 481; U. S. v. Keokuk, Id. 514, 518; Benbow v. Iowa City, 7 Wall. [74 U. S.] 313; Butz v. City of Muscatine, 8 Wall. [75 U. S.] 575, Mayor v. Lord, 9 Wall. [76 U. S.] 409; Heine v. Levee Commissioners, 19 Wall. [86 U. S.] 655; Board of Liquidation v. McComb, 92 U. S. 531.

It is apparent that some of the counties in this district, under authority of acts of the legislature, have issued bonds to fund previous indebtedness, to aid in the construction of railroads, and to build court-houses and jails, to an amount beyond their present ability to pay, without the imposition of a tax too excessive to be borne by any one community, and the imposition of which would lead to general delinquency in the payment of taxes. It would seem to be for the interest of the creditors and counties alike, in such cases, by negotiation to reduce the volume of indebtedness within a limit the counties are able to pay, and for the counties thereafter to pay the interest without the addition of costs. Especially would this be a just measure in the case of those counties that received little or no consideration for their bonds, by reason of the improvident action on the part of their officers and the fraudulent action of the parties to whom the bonds were originally issued. But this is a matter which addresses itself to the counties and their creditors, and over which this court has no control, and which cannot be effected through its agency.

This court is powerless, in this class of cases, to relieve against the results of bad laws and the folly of the people in voting, and their officers in issuing, bonds under such laws. In answer to an appeal similar to appeals that have been made to this court in this class of cases, the supreme court of the United States said: "The counsel for the plaintiff in error has called our attention, with emphasis and eloquence, to the diminished resources of the city and the disproportionate magnitude of its debt. Much as personally we may regret such a state of things, we can give no weight to considerations of this character, when placed in the scale as a counterpoise to the contract, the law, the legal rights of the creditor, and our duty to enforce them." City of Galena v. Amy, 5 Wall. [72 U. S.] 705.

Popular opinion, for the time being, in particular localities, however unanimous it may be, and from whatever cause arising, cannot in a court of justice be allowed to prevail against the constitution and legal rights of the humblest suitor. Should this court yield to such influences, it would thereby only add additional costs to the already heavy burdens of these counties; for its error would meet with speedy correction in that court whose judgments in exposition of the rights of suitors under the constitution of the United States are binding on all courts, and uniform in their operation on all persons and in all places within the jurisdiction of the United States. And this court would not long enjoy the esteem and confidence of the people of these very counties themselves if it should strike down the constitution and the law to give them a temporary relief and gain their present applause.

An order will be entered directing the peremptory writ of mandamus to issue in the terms of the rule. This opinion is applicable to all cases of judgments rendered on bonds issued prior to the adoption of the present constitution, under acts requiring a levy of a sufficient tax to pay them.

The clerk is directed to forward a certified copy of this opinion to the county courts of the several counties against whom peremptory writs may be awarded in similar cases. Ordered accordingly.